Luz C. QUILES,

v.

FINANCIAL EXCHANGE CO.,[1]
c/o UCAC, Inc., d/b/a the
Money Mart

**Appeal of Dollar Financial Group, Inc.**

Superior Court of Pennsylvania.

Argued March 1, 2005.
Filed July 6, 2005.

---

1. The parties agree that the correct name of the defendant is Dollar Financial Group, Inc. and the identification of the defendant in the complaint as Financial Exchange Co. is erroneous.

Stephwn G. Harvey, Philadelphia, for appellant.

William P. Coffin, Easton, for appellee.

Before: ORIE MELVIN, KLEIN, and MONTEMURO *, JJ.

KLEIN, J.:

¶ 1 Dollar Financial Group, Inc.[2] ("Dollar") appeals from the order denying its Petition to Compel Arbitration and Stay Judicial Proceedings[3] in a defamation action brought by Appellee, Luz C. Quiles. Quiles, a former employee of Dollar, claimed Dollar falsely accused her of stealing money from the company and that she

was terminated for that reason. After Quiles filed her complaint in the Court of Common Pleas of Lehigh County, Dollar filed a petition to compel arbitration in accordance with dispute resolution procedures set forth in Dollar's Employee Handbook (Handbook). Finding that Quiles never received a copy of the Handbook, the only document containing the arbitration provisions, and, therefore, there could be no meeting of the minds to arbitrate in accordance with company policy, the trial court denied Dollar's petition.

¶ 2 Because Quiles was never given the handbook that included the information explaining the company's policy to exclusively arbitrate any workplace disputes, she was unable to accept the terms of the agreement to arbitrate. Without her acceptance, there was no agreement formed between the parties and, thus, no grounds to compel arbitration of the present claims. Accordingly, we affirm.

*FACTS*

¶ 3 Quiles was hired in late July, 2001[4] as a part-time customer service representative (teller) in its Allentown, Pennsylvania store. On August 28, 2001, Quiles signed an Employee Acknowledgment Form (Form) given to her by her store manager, Catalina (Cat) Delgado. The Form stated that Quiles had received and read the company Handbook and that she

---

* Retired Justice assigned to the Superior Court.

2. Dollar does business as Money Mart. It is a money lending institution.

3. In order to determine whether a claim is subject to arbitration, judicial inquiry is limited to the questions of whether a valid agreement to arbitrate was entered into and whether the dispute involved falls within the scope of the arbitration provision. *McNulty v. H & R Block, Inc.*, 843 A.2d 1267 (Pa.Super.2004). As an appellate court, our review of an order denying a petition to compel arbitration is

limited to determining whether the trial court's findings are supported by substantial evidence and whether it abused its discretion in denying the petition. *Goldstein v. Depository Trust Co.*, 717 A.2d 1063, 1065–66 (Pa.Super.1998).

4. Quiles received her first bi-weekly paycheck from Dollar on August 10, 2001. This check covered the two-week period ending Saturday, August 4, 2001. Therefore, it appears that Quiles began work on or around July 23, 2001.

understood and agreed to be bound by its terms. Notably, the Form stated that prior to signing it, the employee had carefully read the Handbook which "include[ed] the DISPUTE RESOLUTION PROGRAM and provisions relating to arbitration." This form did not contain any further language explaining the policy or process of arbitration adopted by the company. Although Quiles admits she signed the Form, she contends she never actually received a Handbook. She also avers that she requested a handbook from her district manager, but was never provided one.

¶ 4 The Handbook contained a section entitled "Dispute Resolution Program" (DRP),[5] an internal dispute procedure, that provided for the use of an employee hotline or a conference between the employee and a representative of Dollar's management team. If these internal procedures did not prove successful in resolving an employee's claims, an employee had the option to request private arbitration with the American Arbitration Association (AAA). The Handbook also provided that all employees who accepted employment or continued current employment after July 1, 1995, agreed to be bound by the terms of the DRP, both during and after their employ with Dollar, as the exclusive means to resolve any legal claims against the company.

¶ 5 On July 21, 2004, the trial court held an evidentiary hearing to determine whether in fact a valid agreement to arbitrate existed between the parties. At the hearing Quiles and two former Dollar employees, all supervised by manager Cat Delgado, testified that they had not been given a copy of the employee handbook after being hired by Dollar.

¶ 6 The trial court ultimately denied Dollar's request to compel arbitration, finding that the employees' testimony was credible and established it was "customary practice by Ms. Delgado not to supply employee handbooks to new hirees." Trial Court Opinion, 10/18/2004, at 7. Specifically, the court found that because Quiles never received the Handbook, she could not have been fully informed of the arbitration policy and provisions. The court also noted that Quiles was from Puerto Rico, had difficulty with the English language, had never completed high school and was unfamiliar with the term "arbitration." Under such circumstances the court determined there was no "meeting of the minds on any of the handbook terms, including the arbitration procedure." Id. at 8.[6]

¶ 7 Dollar raises the following three questions on appeal:

(1) When Quiles signed the acknowledgement that she read the handbook, did that incorporate the terms of that handbook by reference?

(2) Was there consideration for agreeing to arbitration several weeks after employment started in that Quiles received continued employment?

---

5.  Specifically, the handbook detailed a three-step process (DRP) for resolving any employee disputes: (1) an open door policy; (2) the conference; and (3) arbitration. Moreover, the terms of the DPR could only be modified by providing notice of the change to employees. Handbook, at 27.

6.  On the other hand, the trial court discredited Delgado's testimony, finding discrepancies in her recounting of when Quiles re-

ceived the employee handbook and signed the acknowledgment form in relation to the commencement of her employment with Dollar. Rather than Delgado's stated time period that the signing of the Form and commencement of employment occurred within a few days of each other, it was closer to one month after Quiles started working at Dollar that she signed the form.

(3) Was the arbitration agreement one-sided and unconscionable because Dollar could change the handbook and hence remove the arbitration clause?

However, because we find that there was no valid agreement to arbitrate the present claims, we need not reach the last two questions.

*DISCUSSION*

■ ¶ 8 While this case presents a general question (the enforceability and effect of provisions in employer-employee agreements) that has been addressed in several jurisdictions, including ours,[7] the more fact-specific question presented today of whether an employee is bound to arbitration provisions found in an employee handbook (when that employee was never given a copy of the handbook containing the actual arbitration provisions and had signed an acknowledgement form stating she read such handbook under suspect circumstances) has not been addressed in this Commonwealth to date. Therefore, in order to properly review the trial court's decision regarding the validity of the parties' agreement and determine whether the court's findings are supported by sufficient evidence, we have looked to case law outside our jurisdiction for guidance.

■ ¶ 9 Courts have consistently expressed the sentiment that agreements to arbitrate are generally favored. Such agreements will be upheld when the agreement is specific enough (*i.e.,* unambiguous) to cover the employee's claims and where the employee has expressly agreed to abide by the terms of that agreement. Case law generally equates the process of interpreting agreements to arbitrate with that of interpreting contracts, applying the same principles in both types of cases. It is well established that:

> Nothing is better settled than that in order to constitute a contract there must be an offer on one side and an unconditional acceptance on the other. So long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending. There must be a meeting of minds in order to constitute a contract. This doctrine is very familiar and has been recognized many times in our courts.

*Cohn v. Penn Beverage Co.,* 313 Pa. 349, 169 A. 768–69 (1934); *Parsons Brothers Slate Company v. Commonwealth,* 418 Pa. 389, 211 A.2d 423, 424 (1965).

¶ 10 Presently, the court credited Quiles' testimony that she was never given a copy of the Handbook that contained the dispute resolution program, including the arbitration process, for employment-related claims. Specifically, Quiles testified to the following circumstances surrounding her signing of the Form acknowledging receipt of the handbook and its policies:

---

7. *See Morosetti v. Louisiana Land and Exploration Co.,* 522 Pa. 492, 564 A.2d 151 (1989) (whether severance pay policy was communicated and binding on employee where policy was contained in handbook used only by personnel manager); *Luteran v. Loral Fairchild Corp.,* 455 Pa.Super. 364, 688 A.2d 211 (1997) (whether employer-employee relationship was considered at-will based upon language in employee handbook); *Vincent v. Fuller Company,* 400 Pa.Super. 108, 582 A.2d 1367 (1990) (whether language in employee's policy and procedure manual created a binding contract altering employee's at-will status); *Darlington v. G.E.,* 350 Pa.Super. 183, 504 A.2d 306 (1986) (enforceability and effect of employment contract on appellant's status as at-will employee); *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 511 A.2d 830 (1986) (effect employee handbook has on employer with regard to employee's discharge); *Banas v. Matthews International Corp.,* 348 Pa.Super. 464, 502 A.2d 637 (1985) (whether employee could bring breach of contract action based upon language in employee handbook).

A: She (Catalina Delgado, Quiles' manager) just came to the front [of the store] and told me—made a copy and told me you need to sign this. And I say, "Why's that?" And then she said, "It's the paper for the handbook." I said, "Where's the handbook?" And she just said, "Just 'f' sign that because I'm going to get in trouble." She just was very verbally telling things.

Q: And again, did you ever receive a copy of the handbook?

A: No, I never received it. Nope. Never.

Q: Did anybody ever tell you anything about arbitration?

A: Never heard the word until you told me.

* * *

Q: Did you ever ask for a handbook?

A: At one point I did because I'm very organized and I like things to be proper, but Cat[alina Delgado] was very busy and everything was just like out of place, and needs to be organized, and we just left it like that. I never asked her for it again.

Q: And you don't know what arbitration is[?]

A: No, I do not.

Q: Or the terms of the arbitration[?]

A: No, I do not.

N.T., 7/21/2004, at 61–63. In addition to Quiles, two former Dollar employees testified that they never received or even saw an employee handbook after they began working for the company, under the direction of Delgado. *Id.* at 96. One of these employees testified that he did not even sign the acknowledgment form. *Id.* at 96. They also stated that no one at Dollar ever explained what arbitration is or the company's process for resolving disputes. *Id.* at 97, 103.

¶ 11 In *Morosetti v. Louisiana Land and Exploration Co.*, 522 Pa. 492, 564 A.2d 151 (1989), our Supreme Court was faced with the issue of whether employees could enforce an employer's severance policy when the terms of that policy were never communicated as part of a definite offer of employment. The court found that the employees were unable to show that, other than an internal policy contained in a manual for use by the company's personnel manager, they had ever been offered the policy as a binding term of employment. The court stated "An offer must be intentional, definite, in its terms and communicated, otherwise the minds cannot meet." *Id.* at 152 (emphasis added).

¶ 12 Although Dollar published its arbitration process in its *employee* handbooks, unlike the facts in *Morosetti,* it has no binding effect on employment-related actions if that policy is never actually communicated to an employee by ensuring that the handbooks are distributed to its employees. Without receipt or delivery of the Handbook which was the only document containing the relevant arbitration provisions, Quiles was unable to knowingly and voluntarily waive all other means of dispute resolution. *See also Leodori v. CIGNA,* 175 N.J. 293, 814 A.2d 1098, 1105 (2003) (in order for employee to validly waive statutory right to jury trial in place of arbitration, waiver must be "explicit, affirmative agreement that unmistakably reflects the employee's assent.").

¶ 13 This situation is distinguishable from those cases cited by Dollar where a party's failure to *read* a contract will not justify nullification or avoidance of the bargained for agreement. Here, without a copy of the Handbook, Quiles was not even given the opportunity to read the terms of the arbitration agreement; there was no arbitration clause in the acknowledgment form signed by Quiles and nothing in the form indicated that she would be waiving her right to a judicial forum. The acknowledgment form only mentioned that the company had "provisions relating to

arbitration." This language hardly communicates to an employee exactly what those provisions contain substantively—*i.e.*, do they provide for arbitration as the exclusive means to resolve workplace disputes, is arbitration merely an acceptable form of dispute resolution in addition to bringing claims in a judicial forum, or do they just discuss the arbitration process generally?

¶ 14 Dollar also claims that because Quiles signed the form which stated that "[she] ha[d] received the Dollar Financial Group, Inc. Employee Handbook[, and] ... ha[d] carefully read this handbook ... before signing below," unless she had a valid defense to invalidate the agreement to arbitrate, she should be bound to arbitrate the present claim. Dollar argues that unless there was a finding of fraud, duress or unconscionability, Quiles had no viable defense to unenforceability of the contract to arbitrate. *See* 42 Pa.C.S.A. § 7303 (validity of agreement to arbitrate).

¶ 15 We acknowledge that, as a matter of public policy, our courts favor enforceability of agreements to arbitrate. *Keystone Tech. Group, Inc. v. Kerr Group, Inc.*, 824 A.2d 1223 (Pa.Super.2003). In fact, under our state's statutory arbitration act, a written agreement to submit any controversy between parties to arbitration is valid, enforceable and irrevocable, "save upon such grounds as exist at law or equity relating to the validity, enforceability or revocation of any contract." 42 Pa.C.S.A. § 7303. However, such agreements are upheld only where it is clear that the parties have agreed to arbitrate in clear and unmistakable manner. *Emmaus Municipal Auth. v. Eltz*, 416 Pa. 123, 204 A.2d 926 (1964).

¶ 16 With these principles in mind, we note that the trial court also found that Quiles "signed the acknowledgment [form] under pressure from her supervisor, Ms. Delgado." Trial Court Opinion,

10/18/2004, at 7. Specifically, Quiles testified that Delgado told her to "just 'f' sign that because I'm going to get in trouble." N.T., 7/21/2004, at 61. Given this finding, coupled with the fact that Quiles was neither represented by counsel nor given the opportunity to consult with an attorney before she was told to sign the form, the court properly determined that the parties had not "agreed to arbitrate in [a] clear and unmistakable manner." *Emmaus, supra.* Moreover, given Quiles' lack of command of the English language and unfamiliarity with the term arbitration, let alone the process generally, the court did not abuse its discretion in failing to compel arbitration. *Cf. Sarbak v. Citigroup Global Markets, Inc.*, 354 F.Supp.2d 531 (Dist. N.J.2004) (where employee possessed an academic background in mathematics and computer programming, he was certainly more than capable of understanding employer's arbitration provisions); *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144 (2d Cir.2004) (where employee signed various documents, including one with an arbitration provision, court found arbitration was properly ordered for employment-related claims, where employee was a "competent adult (with an MBA from a top-tier school)," he was capable of understanding form he signed and had the burden to have any concerns addressed before signing form).

*CONCLUSION*

¶ 17 In coming to this decision today, we reaffirm the basic precept that "in determining whether parties have agreed to arbitrate, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties." *Highmark Inc. v. Hospital Service Ass'n of Northeastern Pennsylvania*, 785 A.2d 93 (Pa.Super.2001) (emphasis added). Here,

Quiles could not validly agree to arbitrate her claims without first having been given a copy of the Handbook, the only document that detailed and explained DRP and the company's proposed arbitration process. In essence, the terms of the process were never fully communicated to her. *Morosetti, supra.* Without being given information explaining the company's policy to exclusively arbitrate any workplace disputes, Quiles could not accept the terms of the agreement to arbitrate. *See Hedden v. Lupinsky,* 405 Pa. 609, 176 A.2d 406, 408 (1962) ("To constitute a contract, the acceptance of the offer must be absolute and identical with the terms of the offer."). Without her acceptance, there was no contract formed between the parties and, thus, no grounds to compel arbitration of the present claims. *See* 42 P.A.C.S. § 7304(a); *see also Schreiber v. Olan Mills,* 426 Pa.Super. 537, 627 A.2d 806, 808 (1993) (for agreement to exist and be binding, there must be an offer and acceptance indicating mutual assent).

¶ 18 In addition, the court determined that Delgado's forceful behavior surrounding Quiles' signing of the form (which, incidentally, did not contain any details about the company's mandatory arbitration process) and the facts that Quiles was unfamiliar with the English language and had not even received a high school diploma, further invalidated any such agreement to arbitrate. Thus, the court's decision was supported by competent evidence and there was no abuse of discretion in denying Dollar's petition. *Goldstein, supra.*

¶ 19 Order affirmed.

¶ 20 ORIE MELVIN, J., concurs in the result.