Marlin YORTY and Nora McCormish

v.

PJM INTERCONNECTION, L.L.C., Appellant.

Superior Court of Pennsylvania.

Argued Feb. 5, 2013.

Filed Oct. 2, 2013.

Carl A. Solano, Philadelphia, for appellant.

Howard J. Bashman, Willow Grove, for appellees.

BEFORE: FORD ELLIOTT, P.J.E., MUNDY and FITZGERALD,* JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Appellant, PJM Interconnection, LLC ("PJM"), appeals the denial of its motion for summary judgment below. Finding that the trial court erred in not granting summary judgment, we reverse.

Since our decision goes against their favor, and because this is a summary judgment matter, we will accept the statement of facts presented by appellees:

In December 2009, plaintiff Marlin Yorty and his wife, Nora McCormish, filed suit in the Court of Common Pleas of Philadelphia County against 22 defendants. R.60a. Plaintiffs' complaint asserted two claims. Yorty asserted a claim sounding in negligence—and specifically alleged gross negligence—against the defendants (R.74a–78a), and McCormish asserted a claim for loss of consortium (R.78a).

Defendant PJM Interconnection, L.L.C. is a regional transmission organization [RTO] whose duties include coordinating the flow of electricity on the interstate electrical transmission grid owned and operated by local electric utilities. R.207a. In its role as a regional transmission organization, PJM monitors the transmission grid and notifies local utilities of problems with the grid that the local utility is then required to investigate and remedy. R.208a. As its full name indicates, PJM is organized as a private limited liability corporation.

When a repair that PJM requires a local utility to perform necessitates taking power lines out of service, PJM is responsible for ensuring that the remaining facilities and power lines remaining in service are sufficient to carry power to customers without interruption. R.208a. PJM performs this role with regard to the high voltage power lines located throughout Pennsylvania

---

* Retired Justice specially assigned to the Superior Court.

and in all or parts of 12 other states plus the District of Columbia. R.207a–08a.

Plaintiff Marlin Yorty worked as an electrician for PPL Electric Utilities Corp. at PPL's Juniata Substation in Perry County, Pennsylvania. R.72a. PPL's electricity transmission facilities include a portion of the Juniata–Conemaugh 500kV (500000 Volt) transmission line that transmits electricity between PPL's Juniata Substation and the Conemaugh switching station owned by two other power companies. R.210a.

In 2006, PJM informed PPL that a potential future grid reliability problem existed on PPL's Juniata–Conemaugh 500kV transmission line. R.212a. PPL then investigated the problem and devised a solution. *Id.* On June 13, 2008, PPL asked PJM for permission to take the Juniata–Conemaugh 500kV transmission line out of service on September 30, 2008 to replace the wavetrap on that line. *Id.* In response to that request, PJM studied whether this particular power outage would affect the delivery of power to other customers. R.212a–13a.

On the morning of September 30, 2008, PJM completed its final outage studies for PPL's request and granted PPL permission to remove the Juniata–Conemaugh 500kV transmission line from service so that the repairs could be performed. R.213a. According to plaintiffs complaint, PJM knew that a separate 500000 Volt transmission line, known as the Keystone–Juniata 500kV transmission line, runs parallel within 100 feet of the Juniata–Conemaugh 500kV transmission line for approximately 118 miles, including at the location of the intended PPL repairs. R.2157a. PJM further knew that when the Juniata–Conemaugh 500kV transmission line was de-energized for repairs, that line was vulnerable to induced voltage from the nearby energized Keystone–Juniata 500kV transmission line. *Id.*

Yorty was working in close proximity to the de-energized Juniata–Conemaugh 500kV transmission line on September 30, 2008 when induced power from the nearby parallel Keystone–Juniata 500kV transmission line caused the Juniata–Conemaugh 500kV transmission line to re-energize, inflicting the severe injuries that give rise to Yorty's suit. R.2138a–39a.

Appellees' brief at 3–5.

On October 6, 2011, PJM filed a motion for summary judgment.[1] One of the bases[2] for the motion was a contention that PJM was immune from suit pursuant to a Tariff granted by the Federal Energy Regulatory Commission ("FERC"). The relevant provision of the Tariff stated as follows:

---

[1] PJM is the sole remaining defendant. The other 21 defendants named in the original complaint were dismissed as parties in various stages. PPL Electric Utilities Corporation, appellee Yorty's employer, was dismissed on May 14, 2010, when its preliminary objections, based upon its immunity to suit under the Workers' Compensation Act, were sustained. Ten more defendants were dismissed by stipulation filed April 18, 2011, nine more by stipulation filed August 11, 2011, and the last defendant other than PJM was dismissed by stipulation filed October 14, 2011. Nonetheless, PJM is not alone on appeal as *amicus* briefs have been filed by the American Public Power Association and the National Rural Electric Cooperative Association, and by the Edison Electric Institute and the PJM Transmission Owners Agreement–Administrative Committee.

[2] PJM also contended that under Pennsylvania law, there was no duty owed by PJM to appellees.

10.2 **Liability:** Neither the Transmission Provider, a Transmission Owner, nor a Generation Owner acting in good faith to implement or comply with the directives of the Transmission Provider shall be liable, whether based on contract, indemnification, warranty, tort, strict liability or otherwise, to any Transmission Customer, third party or other person for any damages whatsoever, including, without limitation, direct, incidental, consequential, punitive, special, exemplary, or indirect damages arising or resulting from any act or omission in any way associated with service provided under this Tariff or any Service Agreement hereunder; including, but not limited to, any act-or omission that results in an interruption, deficiency or imperfection of service, except to the extent that the damages are direct damages that arise or result from the gross negligence or intentional misconduct of the Transmission Provider, the Transmission Owner, or the Generation Owner, as the case may be.

PJM Open Access Transmission Tariff at clause 10.2.

In denying the motion for summary judgment, the trial court ruled that there was no affirmative act of Congress authorizing the FERC to grant immunity to RTOs from tort claims. Further, the court held that even if negligence claims were preempted by the Tariff, the issue of whether PJM could still be liable for gross negligence was a jury question.

Following the trial court's March 8, 2012 order, PJM filed a petition on March 12, 2012 with the FERC seeking a declaratory order as to the scope of the immunity provision in PJM's Tariff. PJM served a copy of the petition on appellees who intervened and filed a response. On March 20, 2012, PJM filed a motion for reconsideration with the trial court. On April 2, 2012, PJM filed its notice of appeal to preserve its appeal rights.[3]

On June 7, 2012, the FERC granted PJM's motion for a declaratory order. Therein, the FERC wholly supported PJM's position and found that the Tariff barred all liability for ordinary negligence. On July 9, 2012, appellees requested a rehearing. On January 8, 2013, the FERC denied rehearing and issued an order fully endorsing its previous order. The FERC found that PJM has no direct physical control over the transmission grid, particularly during construction and maintenance. The FERC further held that the responsibility for performing maintenance on the grid and ensuring safety belongs solely with the Transmission Owner. The FERC found that the Transmission Owners Agreement between PJM and the Transmission Owners provides that the Owners will physically operate and maintain all facilities that the Owner possesses. The FERC found that PJM's role is merely one of scheduling when lines are taken out of operation in order to insure a reliable source of energy throughout the regional grid. Moreover, the FERC specifically found that PJM had no duty (or ability) to shut down the parallel Keystone–Juniata

---

**3.** On May 18, 2012, PJM also filed a Petition for Review with this court (No. 55 EDM 2012) seeking review of the trial court's denial of a motion by PJM to amend the trial court's order, docketed March 8, 2012, so that PJM would be certified to file an interlocutory appeal by permission. *See* Pa.R.A.P., Rule 1311, 42 Pa.C.S.A. On June 14, 2012, PJM filed an amendment to the Petition, and on June 29, 2012, this court denied the Petition for Review. On July 30, 2012, PJM filed a Petition for Allowance of Appeal, or, in the Alternative, Petition for Review with the supreme court which raised the same issue (No. 126 EM 2012). On September 25, 2012, the supreme court denied the Petition for Review.

500kV transmission line that re-energized the line on which appellee Marlin Yorty was working.

PJM raises the following issues on appeal:

1. Did the trial court err in denying summary judgment even though PJM's tariff, which has the full force of federal law, expressly states that PJM cannot be held liable for negligence in performing its services and thereby provides PJM with immunity from suit in this negligence action?

2. Did the trial court err in denying summary judgment even though plaintiffs' claims are preempted by federal law because PJM's federal tariff sets forth the duties PJM is authorized to undertake and those duties are inconsistent with the state-law duties on which plaintiffs seek to base PJM's liability in this action?

3. Did the trial court err in denying summary judgment even though, in light of the federal regulatory scheme, Pennsylvania could not and would not impose a duty of care on federally-created regional transmission organizations like PJM to assure the safety of the employees of local public utilities who are performing work on their employers' own electrical transmission facilities?

PJM's brief at 2.

■ Preliminarily, we must resolve a motion to quash this appeal filed by appellees. Appellees contend that this appeal is improperly taken from an interlocutory order. Ordinarily, an order denying a motion for summary judgment is considered interlocutory and unappealable; however, our supreme court has recognized that the collateral order doctrine may provide an exception to this rule. *Aubrey v. Preci-*

*sion Airmotive LLC,* 7 A.3d 256, 261 (Pa.Super.2010), *appeal denied,* 615 Pa. 770, 42 A.3d 289 (2012). We agree and find that it applies instantly.

■ Whether an order is appealable as a collateral order is a question of law; as such, our standard of review is *de novo* and our scope of review is plenary. *Rae v. Pennsylvania Funeral Directors Association,* 602 Pa. 65, 74 n. 8, 977 A.2d 1121, 1126 n. 8 (2009). Moreover, where the issue presented is a question of law as opposed to a question of fact, an appellant is entitled to review under the collateral order doctrine; however, if a question of fact is presented, appellate jurisdiction does not exist. *Aubrey,* 7 A.3d at 262.

The Rules of Appellate Procedure provide as follows:

**Rule 313. Collateral Orders**

(a) **General rule.** An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

(b) **Definition.** A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P., Rule 313, 42 Pa.C.S.A.

■ Thus, to qualify as a collateral order, the order in question must meet three requirements: 1) separability from the main cause of action; 2) importance of the right to be reviewed; and 3) whether the claim will be irreparably lost if review is denied.

*Pridgen v. Parker Hannifin Corp.,* 588 Pa. 405, 905 A.2d 422 (2006), is instructive to our review as it involves the denial of

summary judgment where the defendants unsuccessfully asserted an immunity like defense. *Pridgen* involved the application of an eighteen-year statute of repose enacted under the General Aviation Revitalization Act of 1994 ("GARA"), 49 U.S.C.A. § 40101. Claims for death, injury, and property damage involving certain types of aircraft asserted against manufacturers generally were barred if the accident occurred more than eighteen years after the delivery of the aircraft to the first purchaser. The appellants in *Pridgen* unsuccessfully moved for summary judgment based upon the immunity from suit conferred upon them by GARA. The *Pridgen* court examined whether an interlocutory appeal as of right, pursuant to the collateral order rule, existed from the order denying summary judgment:

> With this frame of reference, we proceed to the specific requirements of the collateral order doctrine. As to separability, this Court has adopted a practical analysis recognizing that some potential interrelationship between merits issues and the question sought to be raised in the interlocutory appeal is tolerable. *See Melvin* [*v. Doe* ], 575 Pa. [264] at 270–71, 836 A.2d [42] at 46 [ (2003) ] (citing *In re Ford Motor Co.,* 110 F.3d 954, 958 (3d Cir.1997)); *accord Johnson v. Jones,* 515 U.S. at 314, 115 S.Ct. at 2157 (explaining that a claim is sufficiently separate from the underlying issues for purposes of collateral order review if it "is conceptually distinct from the merits of plaintiffs claim," that is, where, even if "practically intertwined with the merits, [it] nonetheless raises a question that is significantly different from the questions underlying plaintiff's claim on the merits" (citations omitted)). We believe that the issue that Appellants seek to raise on appeal concerning the application of the rolling provision to the original manufacturer and type cer-

tificate holder is both conceptually and factually distinct from the merits of Appellees' underlying product liability causes of action. Again, to resolve the legal claim presented, an appellate court's frame of reference will be centered on the terms of GARA, not on determinations of fact or the scope of Appellants' liability in the first instance.

In terms of importance, we acknowledge Appellees' position that GARA represents a balance among public, industry, and individual interests. Nevertheless, it seems clear under the terms of GARA, as well as from its developed legislative history, that Congress was concerned with exposure of covered aviation manufactures to both liability in damages and associated litigation costs. Appellees certainly raise a legitimate point that GARA's claims relief approach may not be fully on par with immunities and constitutional entitlements addressed in the lines of United States Supreme Court decisions referenced by Appellants. [ ] We believe, however, that the federal interests underpinning GARA are sufficiently important to justify the intervention of appellate courts in product liability cases in furtherance of the policy of cost control, where central legal contentions about GARA's scope are legitimately in dispute.

Similarly, with regard to the element of irreparable loss, we conclude that the substantial cost that Appellants will incur in defending this complex litigation at a trial on the merits comprises a sufficient loss to support allowing interlocutory appellate review as of right, in light of the clear federal policy to contain such costs in the public interest. Consistent with Appellees' arguments, we realize that future litigants may seek to extend our determination here more

broadly to other statutes of repose. Nevertheless, balancing the potential vindication of the interest in freedom from tort claims created by Congress through GARA against the state interest in curtailing piecemeal appellate review, we find that the former prevails relative to the review of controlling legal issues in the present cases.

*Pridgen,* 588 Pa. at 421–423, 905 A.2d at 433.

■ Instantly, our own analysis will follow almost identical lines. First, the immunity granted PJM under the Tariff is as factually distinct from the underlying negligence action as was the statute of repose from the underlying products liability action in *Pridgen.* To prove negligence appellees must show four elements: 1) a legal duty or obligation; 2) a breach of that duty; 3) a causal link between that breach and the injury alleged; and 4) actual damage or loss suffered by the claimant as a consequence. *Wright v. Eastman,* 63 A.3d 281, 284 (Pa.Super.2013). Immunity is factually distinct from the proof of any of these elements. Immunity simply functions as an absolute defense to this cause of action regardless of the elements alleged or proven. Thus, immunity is wholly separable from the underlying negligence action which factor is confirmed by *Pridgen.*

Second, as in *Pridgen,* we find the importance of PJM's claim of immunity to be paramount. Congress, through the FERC, has a manifest interest in establishing the effective maintenance of regional power grids and in controlling the cost of electricity to consumers by limiting exposure to costly lawsuits. As under *Pridgen,* the federal interests are sufficiently important as to justify the intervention of the appellate court in furtherance of the policies of effective maintenance and cost control.

Third, this case shares the irreparable loss described by *Pridgen:* the substantial cost PJM will incur in defending this complex litigation at a trial on the merits. In sum, we find all three factors present to permit review of PJM's immunity claim under the collateral order doctrine.

Finally, appellees assert that a question of fact remains that bars review under the collateral order doctrine. Appellees argue that even if PJM is immune from ordinary negligence, its immunity does not protect against gross negligence, and PJM's gross negligence remains a question of fact. As will be shown in our analysis *infra,* appellees did not assert any conduct by PJM in their Complaint that could possibly be determined to be gross negligence. Thus, there is no question of fact and we may proceed with our review.

■ We begin our analysis with our standard of review:

Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Hovis v. Sunoco, Inc.,* 64 A.3d 1078, 1081 (Pa.Super.2013), quoting *Cassel–Hess v.*

*Hoffer,* 44 A.3d 80, 84–85 (Pa.Super.2012) (citations omitted). However, we also note that issues concerning preemption are questions of law for which the scope of review is plenary and the standard of review is *de novo. Dooner v. DiDonato,* 601 Pa. 209, 218, 971 A.2d 1187, 1193 (2009).

Congress' authorization to the FERC to set up a network of RTOs was extremely broad:

§ 824a. **Interconnection and coordination of facilities; emergencies; transmission to foreign countries**

(a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest.

16 U.S.C.A. § 824a (in pertinent part).[4]

 Federal preemption has its origins in the Supremacy Clause of the United States Constitution. Pursuant thereto, state laws in conflict with federal laws are without effect. *Altria Group, Inc. v. Good,* 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008).

Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)). Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains. Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law. *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). *Id.,* 555 U.S. at 76–77, 129 S.Ct. 538.

 On the other hand, as PJM indicates, the exercise of a federal agency's delegated authority does not require express congressional authorization:

[W]e have emphasized that in a situation where state law is claimed to be preempted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Savings & Loan Assn. v. De [de ] la Cuesta,* 458 U.S. 141, 154, 102 S.Ct. 3014, 3023, 73 L.Ed.2d 664 (1982). Instead, the correct focus is on the fed-

4. The Commission referred to in this statute was originally the Federal Power Commission. The powers of the Federal Power Commission were subsequently transferred to the FERC and the Federal Power Commission was terminated. *See* 42 U.S.C.A. §§ 7172 and 7293.

eral agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action. The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond that, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area. [*Capital Cities Cable, Inc. v.*] *Crisp,* 467 U.S. at 700, 104 S.Ct. at 2700; *De* [*de* ] *la Cuesta, supra,* 458 U.S. at 152–154, 102 S.Ct. at 3022–3023. It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961); *see also Crisp, supra,* 467 U.S. at 700, 104 S.Ct. at 2700. *City of New York v. F.C.C.,* 486 U.S. 57, 64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988).

██ We find that the power of the FERC to limit liability in order to control costs would very likely be sanctioned by Congress should that question be brought directly before it. We also find that the authority to limit liability in the FERC Tariffs may readily be found in Congress' directive to the FERC to set up a network of RTOs in order to supply abundant electricity with consideration for economy and conservation, and thereafter "upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest." Clearly, the limitation on liability greatly reduces the cost of energy to the general public and is wholly consonant with the authority delegated to the FERC.

PJM's Tariff is the equivalent of a federal regulation. *See California ex rel. Lockyer v. Dynegy, Inc.,* 375 F.3d 831, 839 (9th Cir.2004), *cert. denied,* 544 U.S. 974, 125 S.Ct. 1836, 161 L.Ed.2d 724 (2005). As such, its limitation on liability has the force of federal law and preempts conflicting Pennsylvania law which might allow for a finding of liability for negligence under the circumstances of this case.

██ There is an additional basis for finding preemption. A federal agency's interpretation of its own regulation is controlling unless plainly erroneous or inconsistent with the regulation. *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).[5]

---

**5.** We reject appellees' assertion that *Christopher v. SmithKline Beecham Corp.,* —— U.S. ——, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) has limited or cast doubt on the *Auer* doctrine. *Christopher* merely allows that there are a few additional circumstances where an agency's interpretation of its regulations might not control:

Although *Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is " 'plainly erroneous or inconsistent with the regulation.' " And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." This might occur when the agency's interpreta-

■ The rulings of the FERC, dated June 7, 2012 and January 8, 2013, are not plainly erroneous or inconsistent with the regulation, nor is there reason to suspect the interpretation. The FERC's interpretation of the duties and liabilities of an RTO appears completely consistent with the functions described in its enabling regulation, 18 C.F.R. § 35.34(k), and with PJM's Tariff. Thus, we also find the FERC rulings to be binding on us. Those rulings reached certain conclusions:

31. The Commission therefore finds that, under its Tariff and [Transmission Owners Agreement], PJM lacks direct, physical control over the transmission grid, particularly during construction and maintenance, and that Transmission Owners physically operate the grid in response to PJM's directions. In the context of a transmission maintenance outage, like the one at issue here, PJM instead performs a planning and scheduling function to ensure compliance with reliability standards. But once PJM has determined that a proposed schedule for maintenance is permissible to resolve a reliability problem, the responsibility for physically performing the maintenance, and ensuring safety, lies with the Transmission Owner.

32. The Commission further finds that, under its Tariff and [Transmission Owners Agreement], PJM, as an RTO, is not responsible for ensuring that maintenance procedures are implemented safely by Transmission Owner employees working

on transmission facilities owned by that Transmission Owner. As cited by PJM and the PJM Transmission Owners, PJM Manual 3 assigns responsibility for compliance with the relevant OSHA regulations to the Transmission Owner. Further, as noted by PJM and several intervenors, we agree that PJM lacks the resources to supervise the work crews of all of its Transmission Owners across its entire multi-state footprint.

34. In determining the scope of section 10.2, as it relates to third parties such as employees of Transmission Owners, we first look to the language of the Tariff. Section 10.2 is a broad limitation of liability that protects PJM from liability, other than due to gross negligence or intentional misconduct, "whether based on contract, indemnification, warranty, tort, strict liability or otherwise, to any *Transmission Customer, third party or other person* for any damages ... arising or resulting from any act or omission in any way associated with service under this Tariff." This provision therefore on its face would apply to a tort claim by a third party, such as [appellees], as long as the actions at issue were related to service under the PJM Tariff. As discussed above, PJM's actions in this case, consisting of identifying a reliability constraint and approving PPL's schedule for maintenance, are actions associated with service under its Tariff.

tion conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a "convenient litigating position," or a " 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack[.]"

*Christopher*, 132 S.Ct. at 2166 (citations omitted). We find that none of *Christopher's* additional considerations apply here.

Order on Petition for Declaratory Order, 6/7/12 at paragraphs 31, 32, and 34 (footnotes omitted) (emphasis in original).

32. Second, [appellees] asks the Commission to clarify that PJM has the obligation, under its Tariff, to approve scheduled outages of transmission lines. [They] claim[ ] that this authority includes the ability to deny or reschedule any outage, or to require a Transmission Provider to implement an alternative outage schedule. Specifically, [appellees] assert[ ] that PJM might have been negligent in failing to schedule a simultaneous outage on the transmission line that was parallel to the Juniata–Conemaugh 500 kV transmission line.

35. Although PJM has responsibility for approving scheduled transmission outages and, in some instances, denying or rescheduling outages, this authority does not extend to forcing an outage on another transmission line that happens to be parallel and in close proximity to the line for which the initial outage request was filed. When a Transmission Owner submits an outage scheduling request, PJM's role under its Tariff and TOA is to consider whether the timing of that outage will impact the reliability and efficiency of the transmission system. Neither the PJM Tariff nor the TOA requires PJM to determine whether any additional transmission facilities need to be taken out of service for any reason, as the responsibility for physically performing maintenance and thus for ensuring worker safety remains with the Transmission Owner.

Order Denying Rehearing, 1/8/13 at paragraphs 32 and 35.

Thus, the rulings of the FERC describe PJM, as an RTO, as an entity responsible only for the scheduling of power outages and the maintenance of grid reliability. All other responsibilities, including and especially worker safety, devolve upon the Transmission Owners. The FERC rulings indicate the possibility of PJM liability only in instances of gross negligence, willful misconduct, or where PJM has gone beyond its Tariff responsibilities. (Order on Petition for Declaratory Order, 6/7/12 at paragraph 37, footnote 35 (going beyond Tariff responsibilities).) As noted, we are bound by these rulings.

 Therefore, we must next examine the issues of gross negligence, willful misconduct, and whether PJM has gone beyond its Tariff responsibilities, because these areas of potential liability are all outside of PJM's Tariff's limitation of liability. We may immediately dismiss consideration of willful misconduct or whether PJM has gone beyond its Tariff responsibilities. Appellees' Complaint made no assertions in either regard.[6] Appellees' Complaint, however, did include a catchall provision that asserted gross negligence. (Complaint, 12/21/09 at paragraph 38.) Thus, we must examine whether the Complaint properly pleaded a cause of action for gross negligence against PJM.[7]

The Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101 *et seq.*, contains a similar limitation on liability as to treat-

**6.** We note that the Complaint alleged activities that could be considered outside of the ambit of PJM's Tariff. However, the Complaint was drafted to attempt to attach liability to 22 different defendants. The alleged activities that fell outside of PJM's Tariff were not directly attributed to PJM in the Complaint and clearly applied to other of the original defendants.

**7.** We reject PJM's claim that appellees waived this issue because they failed to assert the

ing physicians, personnel, and facilities, permitting· liability only in instances of gross negligence or willful misconduct. The cases interpreting this law have essentially held that a plaintiff need only plead allegations of negligence, and it thereafter becomes a jury question whether the alleged conduct rises to the level of gross negligence; however, the court can take the decision from the jury (by summary judgment) where the facts, as pleaded, could not possibly support a finding of gross negligence. *Albright v. Abington Memorial Hospital,* 548 Pa. 268, 278–279, 696 A.2d 1159, 1164–1165 (1997). The court also adopted the following definition of gross negligence:

> It appears that the legislature intended to require that liability be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.

*Id.,* 548 Pa. at 278, 696 A.2d at 1164, quoting *Bloom v. DuBois Regional Medi-*

*cal Center,* 409 Pa.Super. 83, 597 A.2d 671 (1991).

▇▇▇ Simply stated, we find that · the allegations of appellees' Complaint do not adequately plead even negligence on the part of PJM, let alone gross negligence. In so finding, we are considering PJM's functions as described by the federal regulations, 18 C.F.R. § 35.34(k), as well as by the FERC rulings. PJM's responsibilities are in scheduling grid outages and maintaining grid reliability. Thus, only allegations of failures regarding scheduling or maintaining reliability could impute negligence on the part of PJM. For instance, appellees allege in their Complaint that the defendants were negligent in failing to properly ground and/or to insure that the transmission lines were properly grounded prior to authorizing the commencement of work. (Complaint, 12/21/09 at paragraph 47(j).) However, this is not within the ambit of PJM's duties, abilities, or responsibilities and cannot form the basis of a finding of negligence or gross negligence on its part.[8] The other particular allegations of negligent acts delineated in the Complaint similarly do not describe actions within the duties, abilities, or responsibilities of PJM.

As noted, a proper allegation of negligence against PJM would need to involve a

possibility of liability based upon gross negligence in response to PJM's motion for summary judgment. "[T]he general rule that issues not raised in the lower court may not be raised on appeal applies only to appellants, not to appellees." *Sullivan v. Commonwealth, Dept. of Transportation, Bureau of Driver Licensing,* 550 Pa. 639, 644, 708 A.2d 481, 483 (1998). PJM cites to *Krentz v. Consolidated Rail Corp.,* 589 Pa. 576, 910 A.2d 20 (2006) for the proposition that "arguments not raised initially before the trial court in opposition to summary judgment cannot be raised for the first time on appeal." *Krentz,* 589 Pa. at 603–604, 910 A.2d at 37. Of course, the party in *Krentz* who failed to raise the argument in the trial court in response to a mo-

tion for summary judgment was the *appellant.* An appellee has no obligation to preserve any argument in the lower court.

8. Grounding the line was clearly the obligation of appellee Yorty's employer PPL Electric Utilities Corporation. PPL's own Safety Rules contains the following provision:

> When working on a de-energized line which is parallel and within 1000 ft. of an energized line 69kV and above, employees shall: Properly ground the line being worked for induced voltage and no point of the line being worked shall be more than 2 miles from a ground.
> Safety Rule 8.66 (in pertinent part).

negligent failure in scheduling or maintaining reliability. For instance, had PPL filed a request to de-energize both the Juniata–Conemaugh transmission line and the Keystone–Juniata transmission line, and PJM only gave permission to de-energize the Juniata–Conemaugh line, that might form the basis of a negligence claim against PJM (which would be barred under the Tariff). Likewise, if an allegation was made that PPL specifically stated in its request that the Juniata–Conemaugh line could not be safely repaired unless the Keystone–Juniata line was also de-energized, and PJM failed to give permission to de-energize both lines, that might form the basis of a claim of gross negligence against PJM. As it stands, however, we see no allegation of negligence in the Complaint that is related to the functions of PJM. Therefore, under no circumstances could a jury find gross negligence on the part of PJM. The lower court should have granted summary judgment in favor of PJM.

In sum, we find that the limitation on liability contained in PJM's Tariff carries the full force of federal law that preempts Pennsylvania law permitting liability for negligence. We further find that we are bound by the rulings of the FERC which come to a similar conclusion.

Accordingly, having found that the trial court should have granted PJM summary judgment because it is immune from appellees' suit, we will reverse the trial court and remand with instructions to enter summary judgment in favor of PJM.

Order reversed. Case remanded. Application to quash denied. Jurisdiction relinquished.

MUNDY, J. concurs in the result.