**[J-81-2019] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CROWN CASTLE NG EAST LLC AND PENNSYLVANIA-CLE LLC, | : | No. 2 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court dated June 7, |
| | : | 2018 at No. 697 CD 2017 Reversing |
| | : | the Order of the Pennsylvania Public |
| v. | : | Utility Commission dated May 4, |
| | : | 2017 at No. M-2016-2517831. |
| | : | |
| PENNSYLVANIA PUBLIC UTILITY | : | ARGUED: October 15, 2019 |
| COMMISSION, | : | |
| | : | |
| Appellant | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                                                    **DECIDED: July 21, 2020**

The provisions of the Pennsylvania Utility Code ("the Code")[1] at issue in this case are unambiguous, and they compel affirmance of the Commonwealth Court's order. Because the Code is clear, the Pennsylvania Utility Commission's ("PUC" or "the Commission") proposed approach to unpacking the Code is entitled to no deference whatsoever. For these reasons, I join the Majority Opinion. I write separately because this case highlights the perilous instability of the scaffolding that has been thrown together over time around the concept of "administrative deference," a notion or totem as to which I have deep and broad misgivings.

---

[1]    *See* Act of July 1, 1978, Pub. L. 598, No. 116, *as amended*, 66 Pa.C.S. §§ 101, *et seq.*

In matters of agency deference, this Court historically has chosen (by volition rather than by command) to take its cues from federal law. *See Wirth v. Commonwealth*, 95 A.3d 822, 841 n.18 (Pa. 2014); *Nw. Youth Servs., Inc. v. Commonwealth, Dep't of Pub. Welfare*, 66 A.3d 301, 311 (Pa. 2013) ("Pennsylvania courts' treatment of deference to administrative agency rules has followed the United States Supreme Court's lead . . . ."). Generally speaking, federal courts employ a tripartite scheme in evaluating agency interpretations.

The most deferential standard applies to circumstances where an agency, acting pursuant to an express or implied delegation of rule-making authority, resolves a statutory ambiguity by some variety of deliberative process, typically (but not necessarily) involving rule-making attended by some degree of formality, such as the invitation and consideration of public notice and comment. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Eagle Envtl. II, LP v. Commonwealth, Dep't of Envtl. Prot.*, 884 A.2d 867, 878 (Pa. 2005) (quoting *Anela v. Pa. Hous. Fin. Agency*, 690 A.2d 1157, 1159 (Pa. 1997)) ("[A]n agency's interpretation of its enabling statute is entitled to great weight and will not be overturned unless it is clearly erroneous," but the legislative delegation of the interpretive rulemaking power must be "clear and unmistakable").[2] The Supreme Court of the United States has observed that "a very good indicator of delegation meriting *Chevron* treatment [lies] in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

---

[2] *Cf. NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) (applying *Chevron* deference to the "deliberative" unilateral position espoused by the Comptroller of the Currency).

As the Majority observes, this Court never has expressly adopted *Chevron*. *See* Maj. Op. at 22 n.11. Nonetheless, this Court has treated administrative deference concordantly with federal law, and federal law is principally informed by *Chevron* and its progeny. For the reasons I set forth below, I question whether and to what extent this Court should rely upon federal law for purposes of assessing whether, when, and to what extent Pennsylvania courts should defer to Pennsylvania agency interpretations of their Pennsylvania enabling statutes.

Pursuant to what sometimes is referred to as "the *Chevron* two-step,"[3] federal courts considering agency interpretations of a statute first must ask whether the statute is clear. If so, then no deference need be afforded to the agency's position. However, when the statute is ambiguous and Congress has signaled its intention to delegate rule-making authority to the agency, the agency's interpretations are afforded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.[4] Notably, *Chevron* deference "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King v. Burwell*, 135 S.Ct. 2480, 2488 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)[5]).

---

[3] *See* Bradley George Hubbard, *Comment*, *Deference to Agency Statutory Interpretations First Advanced in Litigation? The* Chevron *Two-Step and the* Skidmore *Shuffle*, 80 U. CHI. L. REV. 447 (Winter 2013).

[4] *Accord Eagle Envtl.*, 884 A.2d at 878.

[5] This robust federal proposition stands in marked tension with *Eagle Environmental*, in which this Court emphasized the importance of a "clear and unmistakable" delegation of rule-making authority, and observed that "a doubtful power does not exist." *Eagle Envtl.*, 884 A.2d at 878 (quoting *Gilligan v. Pa. Horse Racing Comm'n*, 422 A.2d 487, 490 (Pa. 1980)).

Similarly deferential is the federal standard applied under the United States Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452 (1997). *Auer* calls for judicial deference to an agency interpretation of its own ambiguous regulations. As with *Chevron*, under *Auer*, federal courts are directed to defer to agencies' interpretations of their own regulations when those interpretations are not "plainly erroneous or inconsistent with the regulation." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see Auer*, 519 U.S. at 461; *see also Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 617 (2013) (Scalia, J., concurring and dissenting) ("*Auer* deference is *Chevron* deference applied to regulations rather than statutes."). The Supreme Court has reasoned that "applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives," which Congress delegated to it by vesting the agency with rule-making power. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991).

In recent years, the Supreme Court's enthusiasm for agency deference, and in particular *Auer* deference, has appeared to wane:

> Although *Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, *see Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011); *Auer*, 519 U.S. at 461-62, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" *Auer*, 519 U.S. at 461 (quoting *Robertson*, 490 U.S. at 359). And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." *Id.* at 462; *see also, e.g., Chase Bank*, 562 U.S. at 209. This might occur when the agency's interpretation conflicts with a prior interpretation, *see, e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994), or when it appears that the interpretation is nothing more than a "convenient litigating position,"

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988), or a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," *Auer*, 519 U.S. at 462 (quoting *Bowen*, 488 U.S. at 212; alteration in original).

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citations modified).

In *Talk America, Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 68 (2011), Justice Scalia criticized *Auer*, noting that "[i]t seems contrary to fundamental principles of separation of powers to permit the person who promulgates a law to interpret it as well." *Id.* at 68 (Scalia, J., concurring)(quoting CHARLES DE SECONDAT, BARON DE MONTESQUIEU, SPIRIT OF THE LAWS bk. XI, ch. 6, 151-52 (Oskar Piest ed., Thomas Nugent transl. 1949)[6]) ("When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty . . . .").[7]

That being said, the rumors of *Auer*'s demise have proved exaggerated or at least premature. Just last year the High Court reaffirmed *Auer*'s continuing validity, albeit in a fractured and qualified ruling. *See Kisor v. Wilkie*, 139 S.Ct. 2400 (2019). The factual

---

[6]    The same translation of *The Spirit of the Laws* is available in the public domain at https://ia802701.us.archive.org/22/items/spiritoflaws01montuoft/spiritoflaws01montuoft_bw.pdf.

[7]    *See also Kisor v. Wilkie*, 139 S.Ct. 2400, 2438 (2019) (Gorsuch, J., concurring in the judgment) (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 at 75 (Max Farrand ed., Yale Univ. Press 1911) (noting that the founders believed that "'no maxim was better established' than 'that the power of making ought to be kept distinct from that of expounding, the laws'")).

Justice Thomas once related that Justice Scalia later described *Auer* to him as "one of the worst opinions in the history of this country," whereupon, the story delightfully goes, Justice Thomas reminded Justice Scalia that *Auer* was authored by none other than Justice Scalia. *See* THE HERITAGE FOUNDATION, *Joseph Story Distinguished Lecture: A Conversation with Clarence Thomas* (Oct. 26, 2016), https://www.heritage.org/sites/default/files/2017-11/HL1282.pdf.

details of that case are not essential to this discussion. What is notable is that a bare majority of the Court—over the objection of Justice Gorsuch, joined to varying extents by Justices Thomas, Kavanaugh, and Alito—rejected the invitation to overrule *Auer* and the Court's earlier decision in *Bowles*, 325 U.S. 410. The lead opinion[8] declared that "*Auer* deference retains an important role in construing agency regulations. . .", *Kisor*, 139 S.Ct. at 2408, and ventured that Congress, in delegating rule-making authority to an agency, "is attuned to the comparative advantages of agencies over courts in making" certain "policy judgments," especially where doing so requires "'unique expertise' . . . relevant to applying a regulation 'to complex or changing circumstances.'" *Id.* at 2413 (plurality) (quoting *Martin*, 499 U.S. at 151).

The *Kisor* Court was at pains to underscore *Auer*'s limits at some length, professing that *Auer* deference "is potent in its place, but cabined in its scope." *Id.* at 2408. For example, "when a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based, fair or considered judgment," courts should only defer to an agency's reading "to the extent it has the power to persuade." *Id.* at 2414 (cleaned up). In this regard, the *Kisor* Court observed that even where an ambiguous regulation triggers *Auer* deference, "the agency's reading must fall within the bounds of reasonable interpretation. And let there be no mistake: That is a requirement an agency can fail." *Id.* at 2416 (cleaned up).

---

[8]    Chief Justice Roberts declined to join subsections II-A and III-A of Justice Kagan's opinion, the former of which reviewed *Auer*'s salutary functions. See *Kisor*, 139 S.Ct. at 2410-14 (plurality). However, he provided the dispositive fifth vote for subsection II-B, related below, in which Justice Kagan, at considerable length, delineated the limits upon *Auer* deference. *Id.* at 2414-18. Unless otherwise noted, my citations to *Kisor* refer to those portions of Justice Kagan's Opinion that gained majority support.

The *Kisor* caveats continued:

> [T]he regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's authoritative or official position, rather than any mere *ad hoc* statement not reflecting the agency's views. That constraint follows from the logic of *Auer* deference—because Congress has delegated rulemaking power, and all that typically goes with it, to the agency alone. Of course, the requirement of authoritative action must recognize a reality of bureaucratic life: Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers. . . . But there are limits. The interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context.

> \* \* \* \*

> Finally, an agency's reading of a rule must reflect fair and considered judgment to receive *Auer* deference. That means . . . that a court should decline to defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack. And a court may not defer to a new interpretation, whether or not introduced in litigation, that creates unfair surprise to regulated parties. That disruption of expectations may occur when an agency substitutes one view of a rule for another. We have therefore only rarely given *Auer* deference to an agency construction conflicting with a prior one. . . .

> The upshot of all this goes something as follows. When it applies, *Auer* deference gives an agency significant leeway to say what its own rules mean. In so doing, the doctrine enables the agency to fill out the regulatory scheme Congress has placed under its supervision. But that phrase "when it applies" is important—because it often doesn't. As described above, this Court has cabined *Auer*'s scope in varied and critical ways—and in exactly that measure, has maintained a strong judicial role in interpreting rules. What emerges is a deference doctrine not quite so tame as some might hope, but not nearly so menacing as they might fear.

*Kisor*, 139 S.Ct. at 2416-18 (cleaned up).

These analytical half-measures failed to satisfy Justice Gorsuch. In his persuasive concurring opinion in *Kisor*, Justice Gorsuch, echoing Justice Scalia's previously stated objection to *Auer* deference, laid bare the infirmities in the Majority's opinion, which he accused of offering the doctrine "more of a stay of execution than a pardon." *Id.* at 2425 (Gorsuch, J., concurring). He accused the majority of "impos[ing] so many new and

nebulous qualifications and limitations" as to render the doctrine "maimed and enfeebled—in truth, zombified." *Id.* After a lengthy survey and rejection of the arguments and authorities relied upon by the Majority, Justice Gorsuch observed:

> The majority candidly admits that it finds it impossible to "reduce" this new [*Auer*] inquiry "to any exhaustive test," so it settles for laying out some markers. What are the markers? We are told that courts should often—but not always—withhold deference from an interpretation offered by mid-level agency staff; often—but not always—withhold deference from a nontechnical, "prosaic-seeming" interpretation; often—but not always—withhold deference from an interpretation advanced for the first time in an *amicus* brief; and often—but not always—withhold deference from an interpretation that conflicts with an earlier one.

*Id.* at 2443 (citations omitted). Justice Gorsuch rejected this nebulous ("zombified") approach, arguing that "judges owe the people who come before them nothing less than a fair contest, where every party has an equal chance to persuade the court of its interpretation of the law's demands." *Id.* at 2425.

*Kisor*'s "power to persuade" terminology originally appeared in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). However, *Kisor*'s invocation of this language drew from *Christopher*, an *Auer* deference case, which itself quoted Justice Scalia's dissenting opinion in *Mead Corp.*, a *Chevron* deference case. *Mead Corp.*, 533 U.S. at 250-52 (Scalia, J., dissenting). The gnomic but oft-quoted passage in *Skidmore* from which the phrase is drawn explains in full: "The weight [granted an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. *Mead Corp.* also cited *Skidmore* for the proposition that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its

consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead Corp.*, 533 U.S. at 228 (citing *Skidmore*, 323 U.S. at 139-140).

But even as it has been cited in both the *Chevron* and *Auer* contexts, *Skidmore* generally has been understood as a discrete, third form of administrative deference that applies when what are at issue are informal policies or practices that involve the agency's interpretations of its statutorily-conferred duties. In *Skidmore*, a wartime case, considering whether to privilege the interpretation of an administrator of the Fair Labor Standards Act regarding the triggering event for an employee's entitlement to overtime compensation, the Court noted that Congress created the "office of Administrator," who had "considerable experience in the problems of ascertaining working time in employments involving periods of inactivity and a knowledge of the customs prevailing in reference to their solution." *Skidmore*, 323 U.S. at 137-38. Consequently, while Congress effectively reposed the final determination as to what constituted working time in the courts, the Court nonetheless prescribed deference: "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling . . ., do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 140.

As noted above, this Court generally has looked to federal law in matters of agency deference. *See Wirth*, 95 A.3d at 841 n.18; *Nw. Youth Servs.*, 66 A.3d at 311. But in *Northwestern Youth Services,* we opined that the *Christopher* Court "modified [the] course of the federal jurisprudence" when it opted to apply *Skidmore* rather than *Auer* deference to an agency's interpretation of its own regulation. *Nw. Youth Servs.*, 66 A.3d at 312; *see*

*Christopher*, 567 U.S. at 158-59.[9]  Over time, this Court has developed a simplified dichotomy that distinguishes simply between "substantive" and "interpretative" rule-making.  To the former, we have applied something resembling *Chevron* deference.  For the latter, we have employed an approach akin to *Skidmore*'s.  *See generally Nw. Youth Servs.*, 66 A.3d at 310-12.

The instant case illustrates well the fundamental lack of clarity in discerning the point at which *Chevron* gives way to *Auer* gives way to *Skidmore*, however tidy the nominal distinctions might appear to be.  That same lack of clarity appears in our case law.  At issue here is a mix of statutory interpretation and informal rulemaking of a sort— *interpretive* rule-making in this Court's parlance.  We begin with the Commission's wholly tacit position on a question of how to interpret the Code, which we can glean only from the Commission's ten-year pattern of granting certificates of public convenience ("CPC").  To wit, are providers of Distributed Antennae Systems ("DAS") "public utilities" entitled to CPCs pursuant to 66 Pa.C.S. § 102?  The Commission's affirmative answer was discernible only by conduct and only in retrospect; for ten years, PUC undertook no formal process to address the question when it became salient.  Instead, DAS providers simply filed for CPCs in due course and the Commission granted them.  That the Commission

---

[9]      Although this Court has held that a measure of deference "approximating that afforded to legislative rules" applies to an agency's interpretation of its own ambiguous regulation, *see Nw. Youth Servs.,* 66 A.3d at 312; *Commonwealth, Dep't of Pub. Welfare v. Forbes Health Sys.*, 422 A.2d 480, 482 (Pa. 1980), we have cited *Auer* only once, and not on the subject of agency deference.  *See Goldman v. SEPTA*, 57 A.3d 1154, 1177 (Pa. 2012) (citing *Auer* for its substantive holding).  Conversely, our intermediate courts have applied *Auer* uncritically.  *See, e.g., Yorty v. PJM Interconnection, LLC*, 79 A.3d 655, 664-65, 664 n.5 (Pa. Super. 2013) (applying *Auer* deference and rejecting the argument that the *Christopher* Court "limited or cast doubt" upon that doctrine); *Bayada Nurses, Inc. v. Commonwealth, Dep't of Labor & Indus.*, 958 A.2d 1050, 1058 n.7 (Pa. Cmwlth. 2008) (*en banc*).

did not in any sense engage in a rulemaking process in the ten years before the reversal that prompted the instant litigation undermines any claim to deference on par with *Chevron*, which typically applies when an agency has employed a greater degree of deliberation and transparency.

Even when PUC reversed its position, it did not follow a formal rulemaking process. The Commission solicited input from the public, but it did not undertake the sort of formalized notice-and-comment process generally relied upon to establish "legislative rules," *i.e.*, regulations that have binding effect pursuant to a legislative grant of rule-making authority, which we generally have granted some degree of deference. *See generally Nw. Youth Servs.*, 66 A.3d at 310-12 (distinguishing legislative and interpretive rules by virtue of the processes by which they are promulgated). Hence, on any fair account, it remained an instance of interpretive rule-making as we have employed that term, and the question of deference would appear to be governed by *Skidmore* rather than *Chevron*.

But *Skidmore*, if not the entire *Chevron* framework, is a hopeless muddle. As noted, the Supreme Court in *Skidmore* held that federal courts must calibrate their deference to an agency's less-than-formally-rendered interpretative rules based "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,[10] and all those factors which give it power to

---

10 While "consistency with earlier and later pronouncements" is a *Skidmore* factor, the Court has held that *Chevron* deference is not necessarily precluded where an agency's interpretations pursuant to legislatively delegated rule-making authority evolve or even are reversed. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005). The Court in *National Cable* observed that "an initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must

persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Unpacked, this grand language describes nothing more than courts' approach to appellate arguments generally, an enterprise that entails no deference at all. I can identify no Pennsylvania or federal case in which I can conclude with confidence that application of *Skidmore* deference *clearly* led to an agency-advocated ruling that the court would have rejected but for its deference.[11] In any event, by encouraging courts to calibrate the degree of their deference to agency opinions based upon "all those factors which give it power to persuade," *id.*, *Skidmore* does nothing more than recite a judge's job description. As such, it is potentially confusing and essentially useless.

In *Mead Corp.*, Justice Scalia cogently argued that "the rule of *Skidmore* deference is an empty truism and a trifling statement of the obvious: A judge should take into account the well-considered views of expert observers." *Mead Corp.*, 533 U.S. at 250 (Scalia, J., dissenting). When it comes to technical subjects, an expert will tend to have an advantage as a matter of course. As Justice Gorsuch aptly observed:

> No one doubts that courts should pay close attention to an expert agency's views on technical questions in its field. . . . The fact remains, however, that even agency experts can be wrong . . . . *Skidmore* . . . recognized both of these facts of life long ago, explaining that, while courts should of course afford respectful consideration to the expert agency's views, they must remain open to competing expert and other evidence supplied in an adversarial setting.

---

consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Id.* at 981 (cleaned up). But the Supreme Court in *Kisor* observed that the Court seldom has deferred to an agency interpretation of its own regulation that departed from an earlier interpretation. *Kisor*, 139 S.Ct. at 2417-18.

11     *Cf. Kisor*, 139 S.Ct. at 2427 (Gorsuch, J., concurring in the judgment) (noting that in *Skidmore* itself the Court couched its ruling in terms of its independent interpretation of the relevant provisions, turning only afterward to the question of what deference, if any, the Court should grant the views of the Labor Department administrator).

*Kisor*, 139 S.Ct. at 2442-43 (Gorsuch, J., concurring in the judgment) (cleaned up). Courts do not sit to ratify or parrot the directives of experts, nor does the judge offer an expert a doctrinal leg up.

Maintaining the fiction that *Skidmore* has more than aphoristic value (if that) invites only confusion and mischief. Justice Scalia put the point well:

> [The *Skidmore*] doctrine (if it can be called that) is incoherent, both linguistically and practically. To defer is to subordinate one's own judgment to another's. If one has been persuaded by another, so that one's judgment accords with the other's, there is no room for deferral—only for agreement. Speaking of "*Skidmore* deference" to a persuasive agency position does nothing but confuse.

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 24 n.6 (2011) (Scalia, J., dissenting). When we consider an agency's interpretive rule, it is probity, rather than deference, that should dictate the success or failure of an agency's position, whether that position is embodied in an agency course of conduct and stability of interpretation or in interpretive documents issued after a process lacking the hallmarks of formal rule-making pursuant to a statutory grant of authority. Courts should respond to agency requests for deference by saying: "Don't command me. Convince me."

While *Chevron* and *Auer* are premised upon an intentional legislative delegation, *Skidmore*'s underlying rationale has been stated in terms of agency *expertise*.[12] *See*

---

[12]    In *Kisor*, Justice Gorsuch concluded his critique of the somersaults turned by the lead opinion as it strove mightily to preserve *Auer* deference in some shrunken and anemic incarnation by suggesting that *Auer* should be jettisoned in favor of *Skidmore*, "liberating courts to decide cases based on their independent judgment and follow the agency's view only to the extent it is persuasive." *Kisor*, 139 S.Ct. at 2447 (Gorsuch, J., concurring in the judgment) (cleaned up). But in doing so, it seems to me, Justice Gorsuch was proposing to preserve *Skidmore* no more strongly than I perceive it, implicitly acknowledging that *Skidmore* deference is really not deference at all, but rather a context-specific shorthand recalling only judges' fundamentally independent, interpretive function.

*Wirth*, 95 A.3d at 841 n.18 (noting "the specialized role and expertise of administrative agencies"); *accord Nw. Youth Servs.,* 66 A.3d at 311-12.  Here, however, we began with an entirely *ad hoc* statutory interpretation, one that for all we know may have involved no meaningful deliberation whatsoever—specifically, that DAS providers are public utilities under the Code.  Then, without any indication of changes in the relevant circumstances, save the installation of new Commissioners, the Commission elected to review its established practice *sua sponte*, reversing itself after an abbreviated deliberative process that fell short of the customary processes that characterize legislative rules.[13]

In any event, whether a statute imposes a given duty manifestly is a pure question of law that a court should consider *de novo*, privileging no advocate's view to a greater extent than its legal merit warrants.  *See Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 41 n.27 (1977) (expressing doubts regarding the relevance of agency expertise to gleaning whether a private right of action was intended by Congress, a question "peculiarly reserved for judicial resolution"); *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 145 n.8 (2011) (reaffirming *Piper*); *Snyder Brothers, Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1083 (Pa. 2018) (Wecht, J., concurring) ("Statutory interpretation is an important part of the work that we do.  We do not subcontract that interpretive enterprise to administrative agencies.").  While *Chevron* assumes that the legislature has some latitude to provide a broad statutory directive intending that agency experts will flesh out the finer points based upon their institutionally specialized

---

[13]     Two of five commissioners dissented from the Commission's determination.  *See* Order, Review of Issues Relating to Commission Certification of Distributed Antennae System Providers in Pennsylvania, 3/17/2017 (Chairwoman Gladys M. Brown and Vice Chairman Andrew G. Place, dissenting), reconsideration denied, 5/4/2017.

knowledge and expertise, it nonetheless only comes into play upon a finding of statutory

ambiguity.[14]

In this regard, the *Kisor* Court spoke in restrictive terms about when a court may

find ambiguity in the context of the interpretation of regulations:

> [B]efore concluding that a rule is genuinely ambiguous, a court must
> exhaust all the traditional tools of construction. For again, only when that
> legal toolkit is empty and the interpretive question still has no single right
> answer can a judge conclude that it is more one of policy than of law. That
> means a court cannot wave the ambiguity flag just because it found the
> regulation impenetrable on first read. Agency regulations can sometimes
> make the eyes glaze over. But hard interpretive conundrums, even relating
> to complex rules, can often be solved. To make that effort, a court must
> carefully consider the text, structure, history, and purpose of a regulation, in
> all the ways it would if it had no agency to fall back on. Doing so will resolve
> many seeming ambiguities out of the box, without resort to *Auer* deference.
>
> If genuine ambiguity remains, moreover, the agency's reading must still be
> reasonable. In other words, it must come within the zone of ambiguity the
> court has identified after employing all its interpretive tools. (Note that
> serious application of those tools therefore has use even when a regulation
> turns out to be truly ambiguous. The text, structure, history, and so forth at
> least establish the outer bounds of permissible interpretation.) Some courts
> have thought . . . that at this stage of the analysis, agency constructions of
> rules receive greater deference than agency constructions of statutes. But
> that is not so. Under *Auer*, as under *Chevron*, the agency's reading must
> fall within the bounds of reasonable interpretation.

*Kisor*, 139 S.Ct. at 2415-16 (cleaned up).

As the Majority explains, no such ambiguity is apparent in this case, reading the

Code holistically and in light of the federal law that clearly has informed it. Accordingly, I

agree with the Majority that PUC is not entitled to relief.

---

[14]    In this regard, our own rules of construction provide that "[w]hen the words of the
statute are not explicit," we "may" seek to glean the intention of General Assembly's intent
by reviewing "administrative interpretations" of the statute. 1 Pa.C.S. § 1921(c)(8). But
the "may" is telling. Administrative interpretations bear utility only to the extent that they
have legal merit. The rule neither directs nor suggests that agency interpretations must
be accorded deferential weight.