Commonwealth of Pennsylvania : 
By Kathleen G. Kane, Attorney General, :
                                 Appellant :
                                           :
                                           :
                 v.                        :     No. 2422 C.D. 2014
                                           :     Argued: October 6, 2015
                                           :
Philip Morris, Inc.; RJ Reynolds          :
Tobacco Company; Brown &                  :
Williamson Tobacco Corporation;           :
B.A.T. Industries, PLC; The American      :
Tobacco Company, Inc.; C/O Brown &        :
Williamson Tobacco Corporation;           :
Lorillard Tobacco Company; Liggett        :
Group, Inc.; United States Tobacco        :
Company; The Tobacco Institute, Inc.;     :
The Council For Tobacco Research          :
U.S.A., Inc.; Smokeless Tobacco           :
Council, Inc., and Hill & Knowlton,       :
Inc.                                      :

BEFORE:     HONORABLE DAN PELLEGRINI, President Judge
            HONORABLE ROBERT SIMPSON, Judge
            HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**                 **FILED: November 18, 2015**


         In this tobacco litigation appeal, the Commonwealth asks whether the

Court of Common Pleas of Philadelphia County[1] (trial court) erred by denying its

motion to compel single-state arbitration to determine whether it diligently

enforced its qualifying statute in 2004 and by granting the motion to compel

---

[1] The Honorable Patricia A. McInerney presided.

multistate arbitration filed by the participating tobacco manufacturers (PMs)[2] to the 1998 Master Settlement Agreement (MSA). The Commonwealth contends the MSA does not provide for multistate arbitration to decide its diligence because Pennsylvania is not on the same side as other states, and such a reading undermines the Commonwealth's sovereign rights. PMs assert the Commonwealth's appeal of the trial court's interlocutory orders should be quashed for lack of jurisdiction. Upon determining we have jurisdiction over the Commonwealth's appeal, we affirm.

## I. Background

In 1998, 52 states and territories (Settling States), including Pennsylvania, entered into the MSA with PMs. The MSA settled litigation against the tobacco industry for recovery of the Settling States' tobacco-related health-care costs.[3] The tobacco manufacturers that did not participate in the MSA are known as nonparticipating manufacturers (NPMs).

---

[2] PMs comprise two groups of tobacco manufacturers: Original Participating Manufacturers (OPMs) and Subsequent Participating Manufacturers (SPMs). OPMs were the original tobacco companies to settle the claims filed against them by the states and enter the MSA; SPMs, which were not named in the original suit, entered the MSA at a later date. OPMs include Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company. SPMs participating in this appeal include Liggett Group LLC, Brown & Williamson Tobacco Corporation, and C/O Brown & Williamson Tobacco Corporation. OPMs and SPMs filed separate briefs.

[3] The history of the tobacco litigation and details of the MSA agreement were discussed in depth in Commonwealth ex rel. Kane v. Philip Morris USA, Inc., 114 A.3d 37 (Pa. Cmwlth. 2015) (en banc).

Pursuant to the MSA, PMs agreed, among other things, to make substantial annual payments to the Settling States in perpetuity in exchange for release from civil liability. PMs do not make the payments directly to the Settling States; rather, PMs make a single, aggregate payment (MSA Payment) to an Independent Auditor in an amount calculated and determined by the Auditor. The Auditor then allocates the MSA Payment among the Settling States by making individual annual payments (Allocated Payment) in an amount based on each State's pre-set allocable share.

The annual MSA Payment is subject to a downward adjustment known as the NPM Adjustment, which provides the MSA Payment may be lowered by a percentage if it is determined PMs lost market share to NPMs as a result of PMs' compliance with the MSA. The NPM Adjustment is divided among all of the Settling States, according to each State's allocable share, in each year where the NPM Adjustment applies, unless the State meets the diligence exception. Section IX(d)(2)(A) of the MSA.

Under the diligence exception, Settling States may avoid the NPM Adjustment if, during the year at issue, they "diligently enforced" a "qualifying statute," which "effectively and fully neutralizes the cost disadvantages that [PMs] experience vis-à-vis [NPMs] within such Settling State as a result of the provisions of [the MSA]." Sections IX(d)(2)(B), (E) of the MSA. Pennsylvania's qualifying statute is the Tobacco Settlement Agreement Act (TSAA).[4]

---

[4] Act of June 22, 2000, P.L. 394, No. 54, as amended, 35 P.S. §§5671-5675.

Thus, a diligent State is spared an NPM Adjustment which reduces its Allocated Payment. In contrast, a non-diligent State receives a larger downward NPM Adjustment, and thus a smaller Allocated Payment, under the MSA's Reallocation Provision. Specifically, the amount of the NPM Adjustment that would have otherwise applied to that diligent Settling State's Allocated Payment is "reallocated among all [non-diligent] Settling States *pro rata* in proportion to their respective Allocable Shares ...." Section IX(d)(2)(C) of the MSA. As the number of non-diligent States decrease, the reallocation share of the NPM Adjustment increases, and vice versa. A non-diligent State's potential NPM Adjustment is capped at the amount of its MSA Payment.

The parties further agreed that "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor," including NPM adjustments, "shall be submitted to binding arbitration." Section XI(c) of the MSA. The arbitration panel shall be comprised of three neutral arbitrators. Id. "Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator." Id.

Despite the enactment of qualifying statutes by all Settling States, PMs experienced market share loss attributable to their compliance with the MSA. The NPM Adjustments for 1999-2002 were resolved by settlement as to all Settling States, but the NPM Adjustment for 2003 (and subsequent years) was not. This case pertains to the NPM Adjustment dispute for 2004.

By way of further background, the 2003 dispute went to arbitration. Before arbitration commenced, Pennsylvania and other Settling States disputed whether the determination of a State's diligent enforcement was subject to arbitration. The Commonwealth filed a motion in the trial court seeking a declaration that it diligently enforced its qualifying statute in 2003, and that the Independent Auditor properly determined the 2003 NPM Adjustment should not be applied. In response, PMs filed a motion to compel arbitration, which the trial court (the Honorable William J. Manfredi) granted. Reproduced Record (R.R.) at 191a. Judge Manfredi concluded the MSA provided for arbitration, and it explained Pennsylvania, along with the other Settling States, were compelled to join in the selection of a single arbitrator.

With the courts of every Settling State (but Montana) similarly ordering arbitration of the 2003 NPM Adjustment dispute, PMs and most of the Settling States, including Pennsylvania, entered an Agreement Regarding Arbitration (ARA). The parties agreed to multistate arbitration for the 2003 NPM Adjustment dispute. As part of the ARA, PMs agreed to reduce the liability of Settling States determined non-diligent, by 20%. The ARA did not address arbitration terms for future years.

With regard to the current 2004 NPM Adjustment dispute, in June 2014, the Commonwealth filed a motion to compel single-state arbitration to determine its diligence for 2004 in the trial court. PMs responded by filing a motion to compel multistate arbitration. The parties briefed and argued their respective motions. Ultimately, the trial court denied the Commonwealth's motion

5

and granted PMs' motion. The trial court later issued an opinion detailing why all issues related to the 2004 NPM Adjustment dispute must be decided in one multistate arbitration proceeding.

The Commonwealth filed an application to certify the orders for interlocutory appeal by permission, which the trial court denied. The Commonwealth also timely filed a notice of appeal from both orders, asserting appellate jurisdiction under Rules 311(a)(8) and 313 of the Pennsylvania Rules of Appellate Procedure. This Court directed the parties to address the appealability of the trial court's orders in their principal briefs on the merits. Commonwealth Ct. Order, 4/17/15, at 1.

## II. Issues

On appeal,[5] the Commonwealth asserts this Court has jurisdiction to hear its interlocutory appeal as of right pursuant to Pa. R.A.P. 311(a)(8) and Section 7320(a)(1) of the Uniform Arbitration Act (UAA), 42 Pa. C.S. §7320(a)(1), because the trial court denied its motion to compel arbitration. The Commonwealth also maintains the trial court's orders are appealable as collateral orders under Pa. R.A.P. 313.

In turn, PMs argue the appeal should be quashed for lack of jurisdiction because the appeals are interlocutory and do not qualify for any

---

[5] With regard to jurisdictional questions and other questions of law, our standard of review is *de novo*, and our scope of review is plenary. Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n, 55 A.3d 1056 (Pa. 2012); Philip Morris.

6

exception. According to PMs, the trial court's orders do not: (1) deny an arbitral resolution of the parties' dispute, but merely resolve the manner of arbitration by compelling multistate arbitration; or (2) meet the definition of a collateral order.

With regard to the merits, the Commonwealth contends the dispute over whether Pennsylvania diligently enforced the provisions of its qualifying statute must be arbitrated in a single-state proceeding with the Commonwealth on one side and the PMs on the other. In this dispute, the Commonwealth maintains it is not on the same side as other Settling States in challenging their own diligent enforcement. The Commonwealth further claims that compelling multistate arbitration of this dispute is contrary to numerous MSA provisions designed to respect the sovereignty of the Commonwealth.

### III. Discussion
### A. Jurisdiction
### 1. Contentions

Before reaching the merits, we first address the issue of the Court's jurisdiction to hear the Commonwealth's appeal. The Commonwealth asserts that denials of motions to compel arbitration are immediately appealable as of right under Pa. R.A.P. 311(a)(8) and Section 7320(a)(1) of the UAA. Because the trial court denied the Commonwealth's motion to compel single-state arbitration, the Commonwealth contends the order is plainly subject to immediate appeal as of right.

In addition, the Commonwealth asserts both orders are properly subject to appeal as collateral orders under Pa. R.A.P. 313. Under Rule 313 an order is collateral if: (1) the order is separable from and collateral to the main cause

7

of action; (2) the right involved is too important to be denied review; and, (3) the question presented is such that, if review is postponed until final judgment in the case, the claim will be irreparably lost.

In this regard, the Commonwealth contends the order directing multistate arbitration is collateral to the broader action itself. According to the Commonwealth, the main cause of action is the original suit against PMs for tobacco-related healthcare costs, which the parties settled in the MSA. This action arises from the terms of the MSA and the Commonwealth's diligence responsibilities. The dispute of whether the arbitration should be a single-state proceeding between Pennsylvania and PMs plainly raises a collateral and separate question from the underlying merits of the main case.

Next, the Commonwealth maintains the denial of its right to single-state arbitration raises important issues warranting immediate review. Although multiple Settling States joined the MSA, the agreement recognized that each State would maintain its own separate rights. Under the MSA, each State designates its own state court, which will be responsible for interpreting and enforcing the MSA in regard to disputes with that State. And each of those state courts is to look to its own state law. All of this was done out of recognition that each State is a sovereign entity and no State would allow itself to be subject to the courts or the law of a sister State. By ordering the Commonwealth to participate in multistate arbitration, the Commonwealth will be forced to forfeit many of its sovereign rights, including the independent selection of an arbitrator and negotiation of arbitration terms as these would be joint decisions made with sister States.

8

Arbitrators presiding over a multistate proceeding will apply generic legal principles as opposed to Pennsylvania law.

Finally, the Commonwealth asserts this appeal is its only meaningful opportunity to challenge the trial court's orders. A similar arbitration for the 2003 NPM Adjustment lasted almost half a decade. If this Court declines review, the Commonwealth would be forced to arbitrate the 2004 issue through to its completion, spending hundreds of hours and millions of dollars in the process, only to try to reargue this point years later. In the meantime, the Commonwealth would have lost its sovereign right to arbitrate this issue separately. Thus, appeal of this collateral issue is necessary now.

PMs respond the Commonwealth's appeal must be quashed for lack of appellate jurisdiction. An appeal may be taken as of right from an order <u>denying</u> an application to compel arbitration. However, there is no corresponding statutory authority that permits a party to appeal an order that <u>compels</u> arbitration. Although the trial court denied the Commonwealth's motion, it granted PMs' motion. In so doing, the trial court compelled the parties to arbitrate in a multistate proceeding. The end result is the Commonwealth must participate in arbitration. An interlocutory ruling that resolves merely the *manner* of arbitrating a dispute is not immediately appealable under Rule 311(a)(8). Thus, the orders are clearly interlocutory and not immediately appealable.

Moreover, PMs maintain the trial court's orders are not appealable as collateral orders under Pa. R.A.P. 313 because they do not satisfy the Rule's three

conditions, which are stringent. First, PMs contend the orders are not separable from and collateral to the main cause of action. Contrary to the Commonwealth's assertions, the main cause of action is not the original suit brought against OPMs 17 years ago, which was settled by the MSA and court-approved consent decree. The settlement and consent decree extinguished all underlying claims. The trial court's jurisdiction at this point concerns only actions to enforce and apply the MSA. Indeed, that is the only jurisdiction the trial court has ever had over most of the SPMs, that were never parties to the original litigation, but that joined the MSA after settlement. The issue of whether the MSA requires single-state or multistate arbitration is not collateral to the main action, it is the main action.

Second, PMs argue the right involved is not too important. To meet this test, the issue must involve deeply rooted public policy concerns, and it must affect someone other than the parties to the case themselves. The question here concerns merely the manner of arbitrating a dispute under the parties' contract. It affects only the immediate litigants. Moreover, the question involved – the manner of arbitrating disputes under the MSA – is not a serious and unsettled question, and it does not impact public policy. Indeed, both this Court and the Supreme Court declined to hear an interlocutory appeal of the Judge Manfredi's 2006 order compelling the Commonwealth to arbitrate rather than litigate the 2003 NPM Adjustment dispute – an issue far more important than the manner in which arbitration is conducted.

And third, PMs contend the claim will not be irreparably lost if not immediately addressed. The Commonwealth admits it would have an opportunity,

10

after multistate arbitration, "to try to reargue" its single-state position. Appellee OPMs' Br. at 22 (quoting Appellant's Br. at 4). The temporary, but ultimately redressable, deprivation of a right is the opposite of an irreparable loss.

In reply, the Commonwealth reasserts that the trial court denied its motion to compel single-state arbitration. A straightforward application of Section 7320(a)(1) of the UAA and Pa. R.A.P. 311(a)(8) gives this Court jurisdiction. In addition, the Commonwealth responds it meets the three-part test for appeal of a collateral order. According to the Commonwealth, PMs never clearly explain what they think is the main cause of action. Regardless of whether the main cause of action is the underlying merits of the Commonwealth's pre-settlement claims, the enforcement of the MSA as a whole, or the 2004 NPM Adjustment dispute, this appeal regarding the nature of the arbitration forum concerns a separate and collateral issue. As the issue implicates the Commonwealth's sovereign rights, it is too important to be denied review. Finally, the Commonwealth asserts litigating a multistate arbitration is extremely expensive. Although the Commonwealth could later challenge the arbitrator's ruling, the time and money spent arbitrating in the interim would be irreparably lost.

## 2. Analysis
### a) Appeal of Interlocutory Orders as of Right

Rule 311(a)(8) of the Pennsylvania Rules of Appellate Procedure governs interlocutory appeals as of right. It provides an appeal may be taken as of right from an order which is made immediately appealable by another statute or general rule. Pa. R.A.P. 311(a)(8). The statutory authorization is found in the UAA. Specifically, Section 7320 of the UAA provides:

11

(a) General rule.--An appeal may be taken from:

(1) A court order denying an application to compel arbitration made under section 7304 (relating to proceedings to compel or stay arbitration).

(2) A court order granting an application to stay arbitration made under section 7304(b).

(3) A court order confirming or denying confirmation of an award.

(4) A court order modifying or correcting an award.

(5) A court order vacating an award without directing a rehearing.

(6) A final judgment or decree of a court entered pursuant to the provisions of this subchapter.

42 Pa. C.S. §7320 (emphasis added). The UAA provides no corollary for an immediate appeal from an order compelling arbitration. Id.; Maleski v. Mutual Fire, Marine & Inland Ins. Co., 633 A.2d 1143 (Pa. 1993).

It is well-settled that an order compelling arbitration is not a final, appealable order. Maleski; Rosy v. Nat'l Grange Mut. Ins. Co., 771 A.2d 60 (Pa. Super. 2001). When a trial court compels arbitration, the action is stayed pending arbitration, and the trial court retains jurisdiction and supervision over the arbitration. Maleski. The trial court does not address the merits of the parties' claims but merely transfers their dispute to another forum in accordance with the arbitration provision of the underlying contract. Fastuca v. L.W. Molnar & Assocs., 950 A.2d 980 (Pa. Super. 2008), aff'd, 10 A.3d 1230 (Pa. 2011). Consequently, an appellate court lacks jurisdiction to determine the merits. Maleski.

As the Supreme Court explained, an order compelling arbitration is not appealable because "the parties are not forced 'out of court.'"  Id. at 1145 (quoting Gardner v. Prudential Ins. Co., 481 A.2d 654, 655 (Pa. Super. 1984)). "[A]n order compelling arbitration forces the parties into, rather than out of, court." Id.; accord Rosy.

Here, the trial court entered two orders:  one denying the Commonwealth's motion to compel single-state arbitration, the other granting PMs' motion to compel multistate arbitration.  Although the trial court technically denied the Commonwealth's motion, it did not force the parties out of court.  See Maleski.  The trial court's orders merely directed the *manner* of arbitration.  The end result is the matter is headed to arbitration.  Thus, the trial court's orders did not trigger the right of appeal under Pa. R.A.P. 311(a)(8) and Section 7320 of the UAA.

### b) Collateral Orders

Next, we examine whether the trial court's orders are appealable as collateral orders.  Pursuant to Rule 313(a) of the Pennsylvania Rules of Appellate Procedure, "[a]n appeal may be taken as of right from a collateral order of an administrative agency or lower court."  Rule 313(b) defines a "collateral order" as one that is "[(1)] separable from and collateral to the main cause of action [(2)] where the right involved is too important to be denied review and [(3)] the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."  Pa. R.A.P. 313(b) (clause numbers added).

13

The collateral order doctrine must be narrowly construed, and all three prongs must be met before collateral appellate review is allowed. Rae v. Pa. Funeral Dirs. Ass'n, 977 A.2d 1121 (Pa. 2009); Mortg. Elec. Registration Sys., Inc. v. Malehorn, 16 A.3d 1138 (Pa. Super. 2011). "Narrow application prevents the collateral order rule from subsuming the fundamental general precept that only final orders are appealable and from causing litigation to be interrupted and delayed by piecemeal review of trial court decisions." Brophy v. Phila. Gas Works & Phila. Facilities Mgmt. Corp., 921 A.2d 80, 87 (Pa. Cmwlth. 2007). If "an order satisfies Rule 313's three-pronged test," we "may exercise appellate jurisdiction where the order is not final." Rae, 977 A.2d at 1125.

In determining whether an order is separable from and collateral to the main cause of action, the Court must first decide whether review of the order implicates the merits of the main cause of action. Commonwealth v. Wright, 78 A.3d 1070 (Pa. 2013). In other words, we examine "whether the issues appealed can be addressed without analysis of the underlying claims on the merits." Brophy, 921 A.2d at 87. Where review of the order in question does not implicate or affect the merits of the underlying dispute, it is separable from and collateral to the main cause of action. Wright; see, e.g., Miravich v. Twp. of Exeter (Pa. Cmwlth., No. 2066 C.D. 2013, filed July 24, 2014), 2014 WL 3697542 (the main cause of action was review of a preliminary subdivision plan but the issue of which tribunal should do so was separable therefrom).[6]

---

[6] Section 414 of this Court's Internal Operating Procedures authorizes the citation of unreported panel decisions issued after January 15, 2008, for their persuasive value, but not as binding precedent. 210 Pa. Code §69.414.

14

As for the second prong, "[a]n issue is important if the interests that would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by the final judgment rule." Geniviva v. Frisk, 725 A.2d 1209, 1213 (Pa. 1999) (quoting In re Ford Motor Co., 110 F.3d 954, 959 (3d Cir. 1997)). "[I]t is not sufficient that the issue be important to the particular parties. Rather[,] it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." Id. at 1214. Generally, the implication of due process concerns is too important to be denied review. See Commonwealth v. Sabula, 46 A.3d 1287 (Pa. Super. 2012); see also Miravich (holding a party's due process right to have the case heard before a tribunal having jurisdiction over the matter satisfied the second prong).

Finally, with regard to the third prong of the analysis, we ask "whether a right is 'adequately vindicable' or 'effectively reviewable.'" Geniviva, 725 A.2d at 1213 (quoting Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 878-79 (1994)). This question "cannot be answered without a judgment about the value interests that would be lost through rigorous application of a final judgment requirement." Id. For instance, the substantial cost a party would incur in defending a claim may equate to an irreparable loss of a right to avoid the burden entirely. See Pridgen v. Parker Hannifin Corp., 905 A.2d 422 (Pa. 2006); Yorty v. PJM Interconnection, L.L.C., 79 A.3d 655 (Pa. Super. 2013).

As discussed above, an order compelling arbitration is generally not appealable as an interlocutory order under Pa. R.A.P. 311(a)(8) and Section 7320 of the UAA. However, such an order may be appealable as a collateral order in

15

limited circumstances.  See, e.g., Gilyard v. Redev. Auth. of Phila., 780 A.2d 793 (Pa. Cmwlth. 2001); U.S. Auto. Assoc. v. Shears, 692 A.2d 161 (Pa. Super. 1997) (en banc) (USAA).

In USAA, our Superior Court found an order compelling arbitration appealable as a collateral order under Rule 313.  There, an automobile insurer for a car registered in another state sought a declaratory judgment that the policy provided no uninsured motorist (UM) benefits for a pedestrian injured by the insured's stolen car in Pennsylvania.  The pedestrian moved to compel arbitration of the dispute.  The trial court determined the failure to provide coverage was actionable as a tort, and it compelled arbitration of the dispute.

On appeal, the Superior Court determined that "without question, the order to compel arbitration [was] collateral to the main cause of action - the declaratory judgment action ...."  Id. at 163.  Further, "the question of whether a court may order an out-of-state insurer to submit to arbitration on a newly-created tort [was] an important one."  Id.  Finally, the Court decided that "going forward with the arbitration will result in the loss of appellate review, which means that [insurer's] claim under the declaratory judgment action will be irreparably lost."  Id.  Thus, the Superior Court concluded the order was appealable even though it was interlocutory.  Id.

Similarly, in Gilyard, we determined an appeal from a trial court order remanding an eminent domain matter to an arbitrator was appealable as a collateral order.  The statute required that all appeals from the board of viewers be heard

16

only by a trial court, not by arbitration. The trial court's remand order would have mooted the statutory provision barring arbitration. Thus, we concluded the right involved was too important to be denied review, and the claim would have been irreparably lost.

Notwithstanding, unless all three prongs are met, we may not exercise appellate jurisdiction. Rae; Mortg. Elec.; Rosy. For example, in Rosy, passengers injured in a collision petitioned to compel the insurer of the vehicle in which they were riding to arbitrate their claims. The Court determined an order compelling arbitration was not an order separable from and collateral to the main cause of action. Unlike in USAA, Rosy did not involve a new cause of action, and the issues did not have wide-reaching impact that would otherwise evade review. Unlike in Gilyard, the order compelling arbitration in Rosy did not have the significant effect of mooting a statutory provision barring arbitration. Thus, the Court quashed the appeal because the order to arbitrate did not meet the collateral order test. Rosy.

Here, we conclude the Commonwealth satisfies the collateral order test. First, with regard to separability, the main cause of action is the resolution of the 2004 NPM Adjustment dispute under the terms of the MSA. The main cause of action is not, as advanced by the Commonwealth, the underlying merits of the Commonwealth's 1997 claims against the OPMs. This is because the parties settled the 1997 claims by entering into the MSA.

The 2004 NPM Adjustment dispute is essentially the same as the 2003 NPM Adjustment dispute, in which the parties agreed:

> [T]here is a dispute between the Settling States and the [PMs] regarding whether under the [MSA] the [PMs] are entitled to a 2003 NPM Adjustment, including whether the Settling States diligently enforced [q]ualifying [s]tatutes during 2003 such that the 2003 NPM Adjustment does not apply to their Allocated Payments or to the corresponding MSA payments made by the [SPMs].

R.R. at 200a (ARA). The trial court correctly identified the issue in the order granting PMs' motion to compel multistate arbitration as "whether [PMs] are entitled to a 2004 NPM Adjustment, including the Commonwealth's claim that it diligently enforced its [q]ualifying [s]tatute in 2004." Tr. Ct. Order, 11/25/14.

The trial court's orders, specifying that Pennsylvania must participate in multistate arbitration with other Settling States, can be separated from the main cause of action. Significantly, the determination of this appeal regarding the proper arbitration forum does not have the potential to decide any issues in the substantive merits of the case, such as diligent enforcement. In other words, the issue regarding the manner of arbitration may be addressed without any analysis of the main cause of action.

As for the second prong, this appeal concerns whether and to what extent the Commonwealth surrendered its sovereign rights to take part in litigation over the NPM Adjustment dispute. The Commonwealth's inherent sovereign power to exercise jurisdiction over MSA disputes is implicated in this appeal. At

18

stake is the Commonwealth's ability to proceed in single-state arbitration pursuant to state law, including the independent selection of its own arbitrator and negotiation of the arbitration terms. This implicates the Commonwealth's due process right to have the matter heard before the tribunal having jurisdiction. See Miravich. By declining review at this juncture, the Commonwealth would be forced to participate in multistate arbitration before it could reassert its right to single-state arbitration. The issue is important not only to the parties of the MSA, but to the public at large because the sovereign power in our government belongs to the people. See Commonwealth ex rel. Attorney Gen., to Use of Sch. Dist. of Patton v. Barnett, 48 A. 976 (Pa. 1901). Thus, the Commonwealth's sovereign rights implicate broad public policy interests requiring immediate resolution.

Finally, with regard to the third prong of the analysis, the Commonwealth concedes it will have an opportunity, after multistate arbitration, to reargue its single-state position. Appellant's Br. at 4. Ordinarily, the temporary, but ultimately redressable, deprivation of a right does not constitute an irreparable loss. However, if this Court declines immediate review, the Commonwealth will be forced to proceed in relatively more complex, expensive arbitration through to its completion. In the process, it will exhaust substantial resources, and its right to avoid the enhanced burden will be lost. See Pridgen. Should the Commonwealth ultimately prevail on this issue in a later appeal, the victory will be hollow as it will have already arbitrated its diligence in a multistate proceeding.

For these reasons, we conclude the trial court's orders are collateral orders under Pa. R.A.P. 313. Thus, this Court has appellate jurisdiction over the Commonwealth's appeal.

## B. Multistate or Single-State Arbitration
### 1. Contentions

Turning to the merits of the appeal, the Commonwealth argues the MSA does not provide for multistate arbitration to decide its diligence.[7] Agreements to arbitrate must be strictly construed. Relying on Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 599 U.S. 662 (2010), the Commonwealth argues it cannot be compelled to submit to multistate arbitration without a clear statement in the agreement expressly authorizing multistate, consolidation or class arbitration. There is no contractual basis in the MSA for multistate arbitration. In fact, the Commonwealth asserts, PMs implicitly recognized there was no right to compel multistate arbitration when they agreed to reduce the liability of States found non-diligent to entice them to sign the ARA for the 2003 dispute.

Specifically, Section XI(c) of the MSA requires arbitration between "two sides to the dispute." According to the Commonwealth, the only dispute at issue is whether the Commonwealth diligently enforced its qualifying statute in 2004. As to that dispute, there are only two sides: PMs and the Commonwealth. The trial court erred in determining the dispute was between PMs on one side and all Settling States on the other.

---

[7] The Commonwealth no longer challenges that disputes related to the NPM Adjustment, including the Commonwealth's defense of diligent enforcement of its qualifying statue, are subject to arbitration.

20

The Commonwealth maintains it is not on the same side as the other Settling States for purposes of its diligence determination. The MSA's reallocation scheme pits state against state. This is because the more states that are found non-diligent, the lesser the share of the NPM Adjustment for non-diligent States. Conversely, the more states found diligent, the greater the burden for those found non-diligent. As a result of this reallocation scheme, the Commonwealth's interests are directly opposed to the interests of the other States. Thus, the Settling States are not on the "same side."

PMs counter the simple text of the MSA's arbitration provision and the interconnectedness of the Settling States based on the MSA's reallocation of the NPM Adjustment demand multistate arbitration. As the trial court aptly recognized, the dispute is whether PMs are entitled to an NPM Adjustment for 2004, regardless of whether a particular state diligently enforced its qualifying statute during that year.

PMs explain, just as in 2003, the Independent Auditor refused to apply the NPM Adjustment for 2004 based on the Settling States' objections. Indeed, all Settling States asked the Auditor to deny the NPM Adjustment for 2004. Thus, the core dispute is whether the Auditor should have reduced PMs' MSA Payment for 2004. This dispute is more than whether a particular State can successfully claim it diligently enforced its qualifying statute in 2004, which is merely a subsidiary issue to the main dispute.

21

The main dispute that triggered the MSA's arbitration provision is whether PMs are entitled to an NPM Adjustment for 2004. This is clearly a multistate dispute, and all Settling States are all on the same side with PMs on the other side. This dispute necessarily embraces all subsidiary issues, including whether a particular State diligently enforced its qualifying statute. Although Settling States may have competing interests in the diligent enforcement issue, they are squarely aligned on the overarching main issue.

As for the Commonwealth's position that each State should have its own separate diligence arbitration, PMs maintain this would produce an absurdly complicated process for resolving all issues on the NPM Adjustment dispute. Such a divided process would hinder resolution of common issues, such as discovery procedures, the effect of bankruptcy of certain PMs, or the proper determination of interest on NPM Adjustment amounts.

Moreover, PMs assert, the application of the diligent enforcement defense affects all other States. Separate resolution of diligent enforcement disputes would be fraught with inequitable and inconsistent results and would likely result in the development of 52 sets of payment rules. States, affected by another State's diligent enforcement arbitration would have the right to intervene. Intervention "would lead to an absurd result of a large number of separate arbitrations, and separate arbitration panels, being required to resolve a single year's NPM Adjustment dispute that involves all of the same parties and same issues." Appellee OPM's Br. at 32 (quoting Tr. Ct., Slip Op., 2/23/15, at 26.).

22

According to PMs, the bottom line is that the 2004 NPM Adjustment is in dispute, regardless of the particular subsidiary issues that may arise out of or relate to it. This calls for multistate arbitration of the entire dispute, not piecemeal arbitration of its subparts. The reason is simple: a nationwide proceeding would permit all parties to attend and fully and effectively participate; a single set of discovery procedures would govern; and, common issues would be determined, with participation of all parties. A multistate arbitration ensures fairness for all parties. To hold otherwise is contrary to both the spirit and plain language of the MSA.

Finally, contrary to the Commonwealth's assertions, PMs maintain they did not implicitly recognize there was no right to compel multistate diligence arbitration. PMs concede they offered a financial incentive to the States to sign the ARA for the sole purpose of moving the process along as many states, including Pennsylvania fought arbitration.

The Commonwealth replies the only relevant dispute at this time is whether it diligently enforced its qualifying statute. In this regard, the Commonwealth does not share a "side" with any other Settling State. The general dispute over whether PMs are entitled to a NPM Adjustment for 2004 was already determined. What remains is whether the 2004 NPM Adjustment can be taken out of the Commonwealth's Allocated Payment, which depends on the Commonwealth's diligence.

The Commonwealth adds PMs' concerns regarding single-state arbitration are significantly overstated. Twenty-four Settling States settled their diligence claims for 2004, and 17 others agreed to participate in multistate arbitration. Only a handful of states, including Pennsylvania, seek single-state arbitration.

## 2. Analysis

"[A]rbitration agreements are to be strictly construed and not extended by implication." Highmark Inc. v. Hosp. Service Ass'n of N.E. Pa., 785 A.2d 93, 98 (Pa. Super. 2001). In construing the language of an arbitration provision, courts rely on the rules of contract construction. Quiles v. Fin. Exch. Co., 879 A.2d 281 (Pa. Super. 2005); Highmark. Courts must adopt "an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties." Quiles, 879 A.2d at 287 (quoting Highmark, 785 A.2d at 98). "[T]he ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." Id. (citation omitted). Mindful of these principles, we examine the MSA's arbitration provision.

Section XI(c) of the MSA provides, with emphasis added:

Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three

24

neutral arbitrators, each of whom shall be a former Article III federal judge. ....

Subsection IX(j) specifically addresses application of the NPM Adjustment. When such a dispute arises, "[e]ach of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator." Section XI(c) of the MSA (emphasis added).

In addition, Section IX(d)(2) of the MSA provides:

The NPM Adjustment ... shall apply to the Allocated Payments of all Settling States, except ... [a] Settling State's Allocated Payment shall not be subject to an NPM Adjustment ... if such Settling State continuously had a [q]ualifying [s]tatute ... in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year ....

Settling States retain jurisdiction for purposes of implementing and enforcing the MSA. See Sections II(p), VII(a), XVIII(n) & Ex. D of the MSA. For example, Section II(p) defines the "court" as "the respective court in each Settling State ...." In Section VII(a), the parties agreed the court shall have jurisdiction for the purposes of implementing and enforcing the MSA. Section XVIII(n) provides the MSA "shall be governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State." Finally, the parties agreed state-court jurisdiction extended to the subject matters asserted in each Settling State's originating lawsuits identified in Exhibit D to the MSA. Section VII(a) & Ex. D of the MSA.

However, these provisions do not affect the arbitration of certain disputes. The MSA specifically excepts arbitral disputes, namely disputes relating to the Independent Auditor's calculations or determinations regarding the NPM Adjustment, from state-court litigation. Section VII(a) of the MSA (state-court litigation of MSA disputes is required "except as provided in ... §XI(c) ....").

Moreover, the issue of whether the NPM Adjustment disputes must be arbitrated was previously settled in connection with the 2003 dispute. Thus, in 2006, the Commonwealth filed an action in the trial court seeking a declaration that it diligently enforced its qualifying statute in 2003, and it was entitled to its full allocable share of the MSA Payment for that year. PMs responded by filing a motion to compel arbitration, arguing the question of diligence was subject to arbitration per the terms of the MSA and should be resolved by a uniform set of rules. Judge Manfredi agreed. He determined the dispute was subject to arbitration under the MSA because it concerned the operation and application of the NPM Adjustment. He therefore granted PMs' motion and dismissed the Commonwealth's motion.

In reaching his conclusion, Judge Manfredi relied on the terms of the MSA, which he observed were the result of "lengthy negotiations between sophisticated parties." R.R. at 197a. He opined:

> [W]hether there was diligent enforcement of the [q]ualifying [s]tatute is a dispute which the courts of the various settling states, generally, and this court, in particular, are most qualified to address. In an arbitration proceeding under the MSA, as many as 52 separate 'Settling States', with competing interests, will be compelled to join in the selection of a single arbitrator, to

26

> sit with an arbitrator selected by the PMs, who share a unity of interest, and a third arbitrator selected by the first two. Moreover, the issue of 'diligence' in enforcement of the [q]ualifying [s]tatute is very much a local one. The vagaries of population size and distribution, geography, market penetration by NPMs, to name but a few factors, must be taken into account in determining whether a state has been diligent. Simply put: that which constitutes diligence in our sister state of North Dakota will assuredly be far different from diligence in our neighbor New York.
>
> That being said, the court reluctantly finds that the scale nonetheless tips in favor of arbitration. As noted, these were highly sophisticated parties, with the assistance and counsel of armies of highly paid lawyers. Under the circumstances presented, the hereinbefore cited legal authorities compel the court to leave the parties to their bargain, however, flawed and ill conceived it may be. ....

R.R. at 198a (emphasis added). Although Judge Manfredi questioned the wisdom of multistate arbitration, he nevertheless determined that is how the parties agreed to resolve NPM Adjustment disputes. Although Judge Manfredi's comments regarding the multistate arbitration are non-binding dicta, his interpretation of the MSA is nevertheless persuasive.

Here, as in 2003, the 2004 dispute arises out of the determinations made by the Independent Auditor regarding that year's NPM Adjustment. More particularly, the dispute arose when the Independent Auditor refused to apply the NPM Adjustment at the request of the Settling States. Section XI(c) of the MSA, which mandates arbitration, clearly extends to "[a]ny dispute, controversy or claim arising out of or relating to ... any determinations made by, the Independent Auditor," including the NPM Adjustment.

27

As to the NPM Adjustment dispute, there are "two sides" to the dispute. On one side, PMs contend they are entitled to an NPM Adjustment; on the other side, the Settling States oppose application of the NPM Adjustment.

The Commonwealth concedes two preconditions for application of the NPM Adjustment were met for 2004 -- the PMs lost market share and the losses were attributable to market disadvantages as a result of the MSA. According to the Commonwealth, all that remains to be determined is whether a particular Settling State diligently enforced its qualifying statute, which it argues is a state-specific determination. In this regard, the Commonwealth claims it is not on the same side as the other Settling States. It argues the Independent Auditor's post-diligence calculation of the NPM Adjustment is not a significant part of the dispute because the mathematical formula is set forth in the MSA.

The Commonwealth's argument is not persuasive. The diligence dispute is just one part of the overall NPM Adjustment dispute. <u>See</u> <u>Commonwealth ex rel. Kane v. Philip Morris USA, Inc</u>., 114 A.3d 37 (Pa. Cmwlth. 2015) (<u>en</u> <u>banc</u>) (explaining operation of diligence exception to NPM Adjustment and the MSA's Reallocation Provision). The MSA's arbitration provision is broadly written to encompass any controversy arising out of or related to the Independent Auditor's determination and calculation of the NPM Adjustment. Section XI(c) of the MSA. By its own terms, the clause must be read broadly to include all claims related to such determinations and calculations. Whether a particular State diligently enforced its qualifying statute arises from and relates to the Independent Auditor's NPM Adjustment determination that PMs are entitled to

28

an NPM Adjustment and the calculation as to how much. All of the Settling States that did not settle the 2004 NPM Adjustment dispute share the same interest in upholding the Independent Auditor's refusal to apply the 2004 NPM Adjustment.

Although we recognize that some Settling States may have competing interests as a result of the Reallocation Provision, this does not alter the fact that the non-settling Settling States are squarely aligned on the same side of the dispute over the Independent Auditor's determination and calculation of the 2004 NPM Adjustment. Intertwined within this dispute is each Settling State's diligent enforcement.

Moreover, the structure of the MSA supports the interpretation that the diligence issue cannot be treated as a separate, stand-alone dispute. Application of the diligent enforcement defense for any Settling State affects all other Settling States. As we recently explained in <u>Philip Morris</u> with regard to the Reallocation Provision of the MSA, "as the number of diligent states increase, the burden on non-diligent states increases. This is because an increase in the number of diligent states means that there is more adjustment reallocated among a smaller group." <u>Id.</u> at 44. Although Section IX(d)(2) provides the mathematical formula, the Independent Auditor cannot calculate the NPM Adjustment without knowing the diligence determinations of *all* Settling States. Because Settling States have an interest in the diligence determinations of other States, the issue of diligence as it relates to the calculation of the NPM Adjustment is a multistate concern, not just a State-specific issue. As the trial court aptly observed, "because of the interconnectedness of the State's diligent enforcement determinations, a single

29

decision maker has the best chances of producing consistent awards" for all interested states. Tr. Ct., Slip Op., at 25. Indeed, other courts grappling with this very issue have reached this same conclusion.[8]

Although we recognize the challenges presented by multistate arbitration, we believe greater complications would occur by allowing fragmented single-state arbitration. As the trial court noted, allowing each Settling State to have its own diligence separately arbitrated would produce "an absurdly complicated process for resolving all the issues that NPM Adjustments present." Tr. Ct., Slip Op., at 25.

More particularly, the process would entail separate proceedings before separate arbitration panels in various locations, at varying speeds, to determine each State's diligence for the purpose of calculating the NPM Adjustment. "And, because ... every State has an interest in the decision on

---

[8] See Indiana, ex rel. Carter v. Philip Morris Tobacco Co., 879 N.E.2d 1212 (Ind. Ct. App. 2008) (holding this nationwide effect creates the need for a single decision-maker to apply a single set of rules equally to each Settling State); Maryland v. Philip Morris Inc., 944 A.2d 1167, 1180 (Md. Ct. Spec. App. 2008) (reallocation makes having a single decision-maker vitally important); New Mexico ex rel. King v. Am. Tobacco Co., 194 P.3d 749 (N.M. Ct. App. 2008) (finding a compelling logic to having the disputes handled by a single arbitration panel, guided by one clearly articulated set of rules, where all parties can fully and effectively participate); New York v. Philip Morris Inc., 869 N.E.2d 636 (N.Y. 2007) (a single panel can be guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate); but cf. Missouri v. Am. Tobacco Co. (Mo. Ct. App., No. ED 101542, filed September 22, 2015) 2015 WL 5576135 (nationwide arbitration was not intended by the parties in drafting the MSA); Montana ex rel. Bullock v. Philip Morris, Inc., 217 P.3d 475 (Mont. 2009) (PMs capable of negotiating a nationwide forum requirement, but no such language appears in the MSA).

30

diligence for every other State, each of ... [the non-settling] States would need to be able to intervene in every other State's proceeding ... to protect itself." Id. at 26 (internal quotation and citation omitted). "This would lead to an absurd result of a large number of separate arbitrations, and separate arbitration panels, being required to resolve a single year's NPM Adjustment dispute that involves all of the same parties and issues." Id. The obvious disadvantage of separate, parallel proceedings is the risk of inconsistent results.[9] Such complications can be readily avoided by a nationwide arbitration involving all interested parties, as envisioned by the MSA. Submitting the dispute to a single nationwide arbitration panel, chosen by the Settling States and PMs, and guided by a uniform set of rules, affords all interested parties the opportunity to be heard on a level playing field.

Nevertheless, relying on Stolt-Nielsen, the Commonwealth maintains it cannot be compelled to submit to multistate arbitration without express authorization in the MSA. In Stolt-Nielsen, petitioners challenged the submission of their antitrust claims to class arbitration. The parties' arbitration clause was silent with respect to class arbitration. The parties stipulated there was no agreement authorizing class proceedings. Because of the stipulation, an intention to authorize class arbitration could not be inferred from the arbitration agreement. As a result, the U.S. Supreme Court determined the parties' agreement did not

---

[9] See Alabama ex rel. Riley v. Lorillard Tobacco Co., 1 So.3d 1, 14 (Ala. 2008) ("conducting 52 separate arbitration proceedings would likely be fraught with the same type of inequitable and inconsistent results that would arise were the individual state courts to resolve this dispute."); Connecticut v. Philip Morris, Inc., 905 A.2d 42, 47 (Conn. 2006) ("If interpretations of such rules were left exclusively to the courts of the individual settling states ... fifty-two different sets of payment rules might emerge ....").

require class arbitration. Id. Without agreement, the parties could not be compelled to submit their dispute to class arbitration. Id.; see Oxford Health Plans LLC v. Sutter, __ U.S. __, 133 S.Ct. 2064 (2013).

However, the Commonwealth's reliance on Stolt-Nielsen is misplaced. Significantly, there is no stipulation that the MSA precludes multistate arbitration. Although the MSA does not expressly specify multistate arbitration, a reasonable interpretation of the MSA is that the same arbitration panel selected to determine the parties' NPM Adjustment dispute will determine all issues related thereto, including the Settling States' diligent enforcement. Unlike in Stolt-Nielsen, the parties' intention to resolve all issues relating to and arising from the NPM Adjustment dispute by multistate arbitration can be inferred from the MSA.

Moreover, this case does not involve a class action arbitration as in Stolt-Nielsen. In a class action, a tribunal adjudicates the rights of absent or unnamed parties based on evidence common to the class. See id. There are no absent or unnamed parties because each Settling State participates as a party.

In the same way, the Commonwealth argues it cannot be compelled to participate in "consolidated" arbitration without its express consent. However, we are not dealing with a court-ordered consolidation of multiple, separate arbitrations. Rather, the trial court compelled the Commonwealth to participate in the single, nationwide arbitration of the 2004 NPM Adjustment dispute and all issues related to and arising therefrom. Tr. Ct., Slip Op., at 29. More particularly,

the trial court ordered "the Commonwealth to participate in a single arbitration, under a single contract, regarding a single dispute." Id. at 28.

Even if the trial court's opinion could be viewed as consolidating "separate" arbitrations, arbitrations may be consolidated where the parties agreed to do so. See Certain Underwriters at Lloyd's v. Century Indem. Co. (E.D.Pa., No. CIV.A.05-2809, filed August 1, 2005) 2005 WL 1941652. Such agreements may be express or implied. Id.; see Children's Hosp. of Phila. v. Am. Arbitration Ass'n, 331 A.2d 848 (Pa. Super. 1974) (consent implied where multiple contracts contained identical arbitration clauses and the two arbitrations involved the allocation of a potentially shared responsibility). In this case, all parties to the MSA agreed to the arbitration of the NPM Adjustment disputes. The MSA evinces an intention that one nationwide arbitration panel will resolve such disputes.

Finally, with regard to the Commonwealth's argument that the ARA and multistate arbitration process used for the 2003 NPM Adjustment dispute did not set the precedent for disputes arising thereafter, we agree. The ARA dealt with the manner of arbitration for 2003 only. The parties agreed to multistate arbitration, and they did not fully litigate the manner of arbitration. Although the ARA does not direct the manner of arbitration for 2004 or beyond, the MSA does. Both the structure and reasonable interpretation of the MSA require a uniform determination by a single, nationwide arbitration panel.

## C. Sovereignty
## 1. Contentions

Next the Commonwealth maintains the use of a multistate process undermines its sovereign rights. The MSA contains numerous provisions designed to protect the sovereign rights of each Settling State. The trial court's determination that the MSA requires multistate arbitration is at odds with the recognition of sovereignty elsewhere in the MSA. The Commonwealth gave up only narrow slices of its sovereignty. The Court must protect those rights it did not relinquish.

The Commonwealth reiterates its position that it agreed to arbitrate certain matters along with other parties only if they were on the same side of the dispute. The Commonwealth is not on the same side as other Settling States for purposes of the diligence determination. Consequently, it should not have to mutually choose one arbitrator with other States as though they were on the same side.

According to the Commonwealth, multistate arbitration puts the PMs at an unfair advantage as they will be before the same panel of arbitrators on multiple occasions, whereas the Commonwealth will be there only once. Further, use of a multistate arbitration panel creates prejudice in terms of hearing time. In the 2003 arbitration, each state received only 11 hours to make their diligence case before the arbitration panel. This was because the use of one arbitration panel to hear 15 different cases necessitated shorter hearing times.

Finally, the Commonwealth asserts, Pennsylvania's law, TSAA, is different from other States' qualifying statutes.[10] Instead of focusing on each State's laws, efforts and particular circumstances, a multistate arbitration panel is placed in a situation where comparisons are inherent. It serves little purpose comparing and contrasting State's enforcement efforts. Indeed, comparisons are inappropriate when each State's diligence is analyzed according to that State's particular circumstances. Yet, in multistate arbitration, comparisons between States are inevitable and inherently unfair.

PMs counter the relevant issue is what Section XI(c) of the MSA means in the context of a dispute over the Independent Auditor's determination regarding the NPM Adjustment. The arbitration provision dictates that NPM Adjustment disputes and all issues related thereto be decided by arbitration. All parties, including Pennsylvania, agreed to these terms. Although other provisions state that the MSA is governed by the laws of the relevant Settling State, the arbitration for payment-related disputes is not one of them. See Sections VII & XI(c) of the MSA.

By invoking sovereignty, the Commonwealth disregards the provisions of the MSA to which it voluntarily agreed, and it argues a different, special set of rules should apply to it. However, PMs advance, the Commonwealth's sovereignty is respected when the courts follow the clear terms of the MSA and reasonable interpretation of those terms. Moreover, no general

---

[10] The Commonwealth does not explain *how* the TSAA differs from other States' qualifying statutes.

state sovereignty principle trumps the express language to which the Commonwealth agreed. Although there may be some difference between States' qualifying statutes, all are based on the MSA's model qualifying statute.

Like any other party to a contract, the Commonwealth is bound by and should be held to its agreement. Multistate arbitration is the only reasonable interpretation of the MSA based on its plain terms and structure of the MSA.

The Commonwealth replies it is not asking the Court to change the language of the contract to protect its sovereignty. Rather, it asks this Court to enforce the plain meaning of "[e]ach side of the two sides to the dispute." Section XI(c) of the MSA.

## 2. Analysis

The MSA recognizes and protects the Settling States' sovereign rights in numerous respects. Specifically, under the MSA, each State designates its own state court, which is responsible for implementing and enforcing the MSA with regard to disputes within that State. See Sections II(p), VII(a), XVIII(n) & Ex. D of the MSA. And each of those state courts is to look to its own state law. See id. The effect is that no Settling State is subject to the courts or the law of a sister State. Further, Section XVIII(j) of the MSA requires that any amendment to the MSA must be executed by all States affected by the amendment. See Philip Morris.

As discussed above, the parties did not agree to resolve all disputes in state court. The MSA's arbitration provision dictates that NPM Adjustment

disputes, and all issues arising from and related thereto, are to be decided by arbitration. Section XI(c) of the MSA; see Section VII(a) of the MSA. Specifically, Section XI(c) of the MSA requires "[a]ny dispute, controversy, or claim arising out of or relating to" the payment determinations or calculations "made by ... the Independent Auditor" must be arbitrated, including "any dispute concerning the operation or application of any of the adjustments." Section XI(c) further provides: "Each of the two sides to the dispute shall select one arbitrator." Id. As the trial court aptly noted, "it is the plain text of that provision that makes the nature of the arbitration dependent on the nature of the dispute, not some state-by-state default." Tr. Ct., Slip Op., at 34. The nature of the dispute is whether PMs are entitled to an NPM Adjustment for 2004, not merely one State's diligent enforcement defense for that year. Id. As to this dispute, there are two sides – Settling States on one, PMs on the other. Thus, multistate arbitration is the only reasonable interpretation of the MSA's terms.

Contrary to the Commonwealth's assertions, its sovereign rights are not undermined by the application of multistate arbitration. The Commonwealth voluntarily agreed to the terms of the MSA after "lengthy negotiations between sophisticated parties." R.R. at 197a. Its sovereignty is respected when the courts follow the clear terms of the MSA and a reasonable interpretation of them.

## IV. Conclusion

In sum, this Court has jurisdiction over the Commonwealth's appeal of the trial court's orders as they are collateral orders. As to the merits of the Commonwealth's appeal, we conclude multistate arbitration of the NPM

37

Adjustment dispute, which includes whether the Commonwealth diligently enforced its qualifying statute, is the only reasonable interpretation of the MSA. We reject the Commonwealth's sovereign rights argument because the Commonwealth willingly agreed to the terms of the MSA and a reasonable interpretation of them.

Accordingly, we affirm the orders of the trial court compelling the Commonwealth to participate in multistate arbitration.

_____
ROBERT SIMPSON, Judge

Judges Cohn Jubelirer and McCullough did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania :
By Kathleen G. Kane, Attorney General, :
                     Appellant :
                           :
                           :
            v. :    No. 2422 C.D. 2014
                           :
Philip Morris, Inc.; RJ Reynolds :
Tobacco Company; Brown & :
Williamson Tobacco Corporation; :
B.A.T. Industries, PLC; The American :
Tobacco Company, Inc.; C/O Brown & :
Williamson Tobacco Corporation; :
Lorillard Tobacco Company; Liggett :
Group, Inc.; United States Tobacco :
Company; The Tobacco Institute, Inc.; :
The Council For Tobacco Research :
U.S.A., Inc.; Smokeless Tobacco :
Council, Inc., and Hill & Knowlton, :
Inc. :

# O R D E R

       **AND NOW**, this 18th day of November, 2015, the orders of the Court of Common Pleas of Philadelphia County are **AFFIRMED**.


                          _____
                          ROBERT SIMPSON, Judge